611 F.2d 662
 Bankr. L. Rep. P 67,264
In the Matter of CHICAGO, MILWAUKEE, ST. PAUL AND PACIFIC
RAILROAD COMPANY, Debtor, Consolidated Appeals of:
Continental Illinois National Bank and Trust Company of
Chicago, as indenture trustee; Harris Trust and Savings
Bank, as indenture trustee; The First National Bank of
Chicago, as indenture trustee;
and Girard Bank, as indenture trustee, Chicago, Milwaukee,
St. Paul and Pacific Railroad Company, as debtor,
and Chicago Milwaukee Corporation, as shareholder,
Stanley E. G. Hillman, as trustee.
 Nos. 79-1494, 79-1675, 79-1683 and 79-1698.
 United States Court of Appeals,
Seventh Circuit.
 Argued Sept. 17, 1979.
Decided Oct. 2, 1979.
Rehearing and Rehearing In Banc Denied Jan. 2, 1980.
 
 Susan Getzendanner, Mayer, Brown & Platt, Chicago, Ill., for appellant.
 John W. Rowe, Isham, Lincoln & Beale, Chicago, Ill., for trustee.
 Henri F. Rush, Associate Gen. Counsel, ICC, Washington, D.C., Thomas J. Brewer, Special Asst. Atty. Gen., Seattle, Wash., William G. Mahoney, Washington, D.C., Douglas N. Owens, Asst. Atty. Gen., Olympia, Wash., for intervenors.
 Before FAIRCHILD, Chief Judge, and SWYGERT* and TONE, Circuit Judges.
 PER CURIAM.
 
 
 1
 These are appeals from orders of the district court in a railroad reorganization proceeding under Section 77 of the Bankruptcy Act, 11 U.S.C. § 205.[1] Two orders permitted the Reorganization Trustee, Stanley E. G. Hillman[2] (hereinafter Trustee) to borrow money in order to operate the railroad. A third order denied the request of the Trustee for an embargo suspending operations by the Trustee over a major portion of the lines operated by the Debtor railroad, the Chicago, Milwaukee, St. Paul & Pacific Railroad Company (hereinafter Milwaukee Road or Debtor).[3] The Trustee asks us to rule that the district court erred in concluding that it lacked the authority to authorize the requested embargo. The principal appellants on the borrowings issue are the Debtor Milwaukee Road; its principal shareholder, Chicago Milwaukee Corporation; and the railroad's creditors[4] (hereinafter Indenture Trustees). These appellants ask that the orders authorizing the borrowings be reversed. The district court's refusal to grant the embargo is supported by the ICC; the states of Washington, Montana, and Illinois; and several organizations, including representatives of workers employed by the Milwaukee Road. The borrowings orders are supported by the Commission and the State of Montana.
 
 
 2
 * The Milwaukee Road is a railroad carrier engaged in interstate commerce over 9,800 miles of rail lines in the midwestern and western portions of the United States. Following three years of financial losses totalling approximately $100,000,000, it filed, on December 19, 1977, a petition for reorganization pursuant to Section 77 of the Bankruptcy Act. The district court approved the petition and appointed the Trustee on February 13, 1978. During 1978, the Debtor sustained losses of $82,000,000. The Milwaukee Road's current average cash deficit is approximately $500,000 per working day. If the railroad continues to operate its entire system for all of 1979, its estimated losses will be $157,000,000 for the full year. There is no dispute about the poor condition of the tracks and equipment, for which over half a billion dollars in maintenance has been deferred.
 
 
 3
 Since his appointment, the Trustee made available over $100,000,000 from borrowings or deferred obligations to keep the railroad operating, while studying the possibility of reorganization. The railroad's estimated liquidation value is $832,000,000. Its debts amount to $420,000,000, not including labor protection claims to be determined by the ICC in the event of abandonment, which may amount to hundreds of millions of dollars. The district court found the obligations of the Debtor may exceed the liquidation value. Assisted by an independent analysis of the railroad's financial position and potential by Booz, Allen and Hamilton, a management consultant firm, the Trustee concluded that the entire railroad could not be successfully reorganized, but that there was a possibility of successful reorganization of a smaller segment (hereinafter Miles City Sub Core or MCSC) of 2,500 miles running from Louisville through Chicago, Milwaukee, and the Twin Cities to Miles City, Montana.
 
 
 4
 The Trustee's petition to borrow $15,000,000 from the proceeds of sales of mortgaged assets held as security by the Indenture Trustees to operate the entire railroad system for the month of May was granted by the district court on May 4, 1979. The further petitions of the Trustee to embargo traffic on about 70% Of the rail lines operated by Debtor and to authorize priority loans of $20,000,000 to operate the Miles City Sub Core were heard by Special Master Milton H. Gray, appointed by the district court on May 10, 1979. The Special Master recommended approval of the embargo petition as consistent with the public interest and applicable statutes and further recommended approval of the $20,000,000 borrowings to operate the Miles City Sub Core. On consideration of the Master's report, the district court on June 1, 1979 indicated that the embargo proposal "would promote the public interest" but nevertheless rejected the proposal as a discontinuance of rail service, governed by the provisions of 49 U.S.C. §§ 10903-05, and a plan of reorganization, governed by 11 U.S.C. § 205. A discontinuance of rail service or a plan of reorganization would require approval by the Commission before being allowed to take effect. If the embargo had been ordered, the ICC stated that it was prepared, under 49 U.S.C. § 11125, to direct other carriers to render service to shippers affected by the embargo. The ICC's directive would have provided railroad service for over 99% Of the traffic in the territory subject to the embargo for up to 240 days. The trustee suggested that the embargo would not be detrimental to the public interest during the period of directed service because there would be no material reduction of service.
 
 
 5
 On June 19, 1979, the district court ordered the Trustee to issue trustee certificates in the total amount of $20,000,000 to continue service on the entire railroad. Addressing the fact that this borrowing would take priority over the rights of all existing creditors, the court indicated that "(w)e cannot find that the pending borrowing of an additional $20,000,000 will not erode the Indenture Trustee's security, but we do conclude as a matter of law that this will not unconstitutionally impair their contractual rights." The court further ordered the Trustee to immediately commence proceedings before the ICC to abandon the Milwaukee Road's entire rail system and to file a plan of reorganization of the Milwaukee Road with the district court.[5]
 
 II
 
 6
 We must first review the two orders authorizing borrowing upon terms which give the obligations priority over all other debts. Because of the dire financial condition of the Milwaukee Road, such priority borrowings in the form of trustee certificates are the only feasible sources of funds (except for the possibility of government subsidy). Bankruptcy Act Section 77(c)(3), 11 U.S.C. § 205(c)(3), permits the reorganization court to "authorize the trustee . . . to issue certificates . . . for such lawful purposes and upon such terms and conditions and with such security and such priority in payments over existing obligations, secured or unsecured, . . . as might in an equity receivership be lawful."
 
 
 7
 The problem presented here is to define the criteria that should govern the propriety of the district court's authorization of the priority borrowings under this provision. Appellants ask us to adopt a strict three-prong test for approval of issuance of trustee certificates. That test, cited in opinions of several circuits, requires a showing by the trustee that
 
 
 8
 (a) it is imperative to obtain the funds and they cannot be obtained from other sources,
 
 
 9
 (b) creditors will not be injured, and
 
 
 10
 (c) there is a high degree of likelihood that the Debtor can be reorganized within a reasonable time.
 
 
 11
 See In re Erie Lackawanna Railway Co., 563 F.2d 784 (6th Cir. 1977); In re Penn Central Transportation Co., 494 F.2d 270 (3d Cir.), Cert. denied sub nom. United States v. Bankers Trust Co., 419 U.S. 883, 95 S.Ct. 147, 42 L.Ed.2d 122 (1974) (hereinafter Columbus Option); In re Third Avenue Transit Corp., 198 F.2d 703 (2d Cir. 1952). We considered this test in a prior case and observed that even the circuits which formulated it have not applied it consistently and we determined that it is too restrictive. In In re Chicago, Rock Island & Pacific Railroad Co., 545 F.2d 1087 (7th Cir. 1976) (hereinafter Rock Island ), we stated:
 
 
 12
 The Third Avenue/Columbus Option test goes too far. It may force further deterioration of a debtor's situation by preventing interim borrowing which might otherwise be necessary and profitable. This may prevent reorganization altogether, resulting in liquidation with consequent detriment to both unsecured creditors and the public. The standard allows measures such as those taken in the instant case only in the most limited circumstances. We believe the Fifth Amendment does not require such a strict test.
 
 
 13
 545 F.2d at 1090.
 
 
 14
 Following our pronouncement in Rock Island, we are of the view that a more flexible, discretionary approach should be taken with respect to the financial straits of the Milwaukee Road.
 
 
 15
 Aside from the question whether the statute can be interpreted to permit the borrowings, the Indenture Trustees contend that the priority borrowings result in an uncompensated taking of the property of the Debtor and of the security creditors. To force a railroad to continue operations indefinitely at a loss in order that the public may be served is a violation of the Fifth Amendment rights of those who have a security interest in the enterprise. Brooks-Scanlon Co. v. Railroad Commission, 251 U.S. 396, 40 S.Ct. 183, 64 L.Ed. 323 (1920). The Supreme Court has noted, however, that "(t)he rights of the bondholders are not absolute." It then quoted an earlier case:
 
 
 16
 (Security holders) cannot be called upon to sacrifice their property so that a depression-proof railroad system might be created. But they invested their capital in a public utility that does owe an obligation to the public. * * * By their entry into a railroad enterprise they assumed the risk that in any depression or any reorganization the interests of the public would be considered as well as theirs.
 
 
 17
 New Haven Inclusion Cases, 399 U.S. 392, 491-92, 90 S.Ct. 2054, 2109, 26 L.Ed.2d 691 (1970), Quoting Reconstruction Finance Corp. v. Denver & Rio Grande Western Railroad Co., 328 U.S. 495, 535-36, 66 S.Ct. 1282, 90 L.Ed. 1400 (1946). The private claims of the stockholders and security creditors and the public interest in continued railroad service have been reconciled by a line of cases holding that while a railroad cannot be ordered to continue operations indefinitely, it may be ordered to continue service for a reasonable time while the reorganization court and the Commission act on petitions for abandonment and consider alternatives in the public interest. New Haven Inclusion Cases, 399 U.S. 392, 90 S.Ct. 2054, 26 L.Ed.2d 691 (1970); In re Boston & Maine Corp., 484 F.2d 369 (1st Cir. 1973); In re Third Avenue Transit Corp., 198 F.2d 703 (2d Cir. 1952). This is true even though the railroad will be operating at a loss and the creditors' security will be eroding. In re Central Railroad of New Jersey, 485 F.2d 208 (3d Cir. 1973) (En banc ), Cert. denied sub nom. Timpany v. New Jersey, 414 U.S. 1131, 94 S.Ct. 870, 38 L.Ed.2d 755 (1974); In re Valuation Proceedings Under §§ 303(c) & 306 of the Regional Rail Reorganization Act, 439 F.Supp. 1351 (Special Court 1977) (hereinafter Valuation Proceedings ).
 
 
 18
 Even the strongest policy arguments, however, do not allow the reorganization court to ignore the requirements of the Fifth Amendment. In New Haven Inclusion Cases the Supreme Court held that a reorganization court has duties under the Constitution as well as under the Bankruptcy Act and may not disregard claims that injurious consequences will result to secured creditors from the delays imposed by the administrative process. New Haven Inclusion Cases, 399 U.S. 392, 490-91, 90 S.Ct. 2054, 26 L.Ed.2d 691 (1970).
 
 
 19
 In the light of these balancing considerations just stated we review the two orders for priority borrowings in this case. The first order was issued May 10, 1979, shortly after the emergency hearing on May 4. It authorized priority borrowing of $15,000,000; the greater part of these funds had been spent by June 1, and we have no doubt the balance was spent in June. No party has, however, suggested mootness.
 
 
 20
 The record clearly shows that as of May 4 the Milwaukee Road was at the brink of cashlessness. Complete cessation of service by the Debtor was imminent unless funds could be borrowed. There had not been a full opportunity for careful judicial consideration of the proposal to continue service over a segment of the system, or the possibility of reorganization of the Debtor on that basis, or even the possibility of reorganization on any other basis. Moreover, the court decided that the ICC needed time to make plans for directed service by other carriers. It would not be realistic to expect a possibility of reorganization to survive a complete cessation of service by the Debtor, even though traffic might continue to move by directed service under 49 U.S.C. § 11125(a). Accordingly, we conclude that borrowing the $15,000,000 for the purpose of continuing service for a reasonable interval while the various choices were being considered by the court was appropriate. This priority borrowing neither exceeded statutory authority nor violated the Fifth Amendment. We affirm the $15,000,000 borrowing order.
 
 
 21
 The second borrowing order was issued June 19 and permitted priority borrowing of $20,000,000 of Emergency Rail Services Act of 1970 (hereinafter ERSA) funds. It presents more difficult questions. The Trustee initially sought the money only to operate a limited segment of the railroad. There was a strong showing that reorganization could not be accomplished if the Debtor continued to operate the entire system. The borrowing has delayed cessation of service, but the amount is inadequate to delay it until the ICC can carry out its abandonment procedures. Further borrowing will be necessary to keep the entire system in operation until the ICC can reach a decision on the partial abandonment request, estimated as January, 1980 at the earliest. All such borrowings will add to the charges which would have to be borne by the later operation of a part of the system and thus will jeopardize the possibility of any reorganization. Such borrowings will also decrease the funds ultimately available for employee protection and payment of creditors. Thus the $20,000,000 borrowing for the operation of the entire system could well be viewed as an exercise in futility.
 
 
 22
 We do not, however, reach the ultimate question whether the $20,000,000 borrowing could properly be authorized solely for the purpose of delaying cessation of service during part of the period required for ICC consideration of discontinuance. We conclude, as hereinafter explained, that because of the imminent cashlessness the district court erred in its ruling that it could not decide, independently of the ICC, to authorize the borrowing but limit its use of the proceeds to the maintenance of service on the segment of the system which offered the possibility of reorganization.
 
 III
 
 23
 The Trustee petitioned for approval of an embargo[6] of service on 70% Of the system, and for authorization of priority borrowing in order to continue service on the Miles City Sub Core. On the basis of the management consultant's study, the Trustee contended that the Debtor could not be reorganized on the basis of the operation of the entire system; that the MCSC might, upon optimistic assumption, generate a net operating income; and that there is a possibility of reorganizing the Debtor if it operates only the MCSC. Special Master Gray concluded: "(T)hese facts establish that there is little likelihood that the entire Milwaukee Road can be reorganized. They further establish that continued operation of that system through 1979, with the concomitant increase in priority debt of $65,000,000 to $75,000,000 would seriously jeopardize the possibility, which now appears to exist, of successfully reorganizing the most viable portion of that system." The Special Master also determined that there exists a possibility of reorganizing the Debtor on the basis of the MCSC or some other variation of a markedly reduced system. The district court agreed, but concluded that it had no power, independently of ICC approval, to authorize priority borrowings for the limited purpose of operating the MCSC, and thus direct the cessation of service on the balance of the system.
 
 
 24
 A rail carrier subject to the ICC Act may abandon or discontinue any part of its railroad lines or operations over its lines "only if the Commission finds that the present or future public convenience and necessity require or permit the abandonment or discontinuance." 49 U.S.C. § 10903. The carrier is required, after applying for a certificate of abandonment, to send a copy of that petition and a statement of the right to comment on it to the governors of all states which the railroad's proposal would affect, to post copies of the notice in all terminals and stations proposed to be abandoned, to publish in newspapers of general circulation copies of the notice, and to send copies to all of the railroad shippers who would be affected by the proposal. The Commission has the opportunity to conduct an investigation, including public hearings, in determining how to rule on the proposed abandonment. 49 U.S.C. § 10904. By these means the Commission is to determine whether the "public convenience and necessity require or permit the abandonment or discontinuance. In making the finding, the Commission shall consider whether the abandonment or discontinuance will have a serious, adverse impact on rural and community development." 49 U.S.C. § 10903. 11 U.S.C. § 205(o), moreover, empowers the reorganization court to authorize an abandonment of lines of a railroad "but only with the approval and authorization of the Commission when required by chapter 1 of Title 49." A district court under these circumstances will not lightly approve a De facto abandonment until the ICC has had an opportunity to approve it. In the situation before us, however, given the imminent cashlessness of the Debtor, the power of the district court to authorize priority borrowings if lawful in an equity receivership permits a different result.
 
 
 25
 The record establishes that in May, 1979, the Debtor would have run out of cash and been compelled to stop all service but for the $15,000,000 priority borrowing. The same condition was imminent before the end of June, when the proceeds of the $15,000,000 borrowing were exhausted. Without further priority borrowing, it was inevitable that all service would terminate because it was impossible to provide service without cash. It is settled that a railroad that is cashless cannot be required to continue operating to serve the public interest. Brooks-Scanlon Co. v. Railroad Commission, 251 U.S. 396, 399, 40 S.Ct. 183, 64 L.Ed. 323 (1920); Valuation Proceedings, 439 F.Supp. 1351, 1375-77 (Special Court 1977); In re Penn Central Transportation Co., 384 F.Supp. 895, 918-19 & n. 31 (Special Court 1974) (hereinafter Penn Central ). The situation here represents an exception, recognized in Valuation Proceedings, 439 F.Supp. at 1379, n. 49, to the statutory requirement that abandonment or discontinuance of railroad lines requires a finding by the ICC that "the present or future public convenience and necessity require or permit the abandonment or discontinuance." 49 U.S.C. § 10903.
 
 
 26
 Here the proposed embargo order was a recognition of the impossibility of service caused by a lack of cash. But for borrowing, the Debtor could provide no service anywhere in the system. What was really sought was authority to borrow funds solely for use to continue operation of MCSC. The requested embargo order would judicially recognize that although the borrowing would prevent cashlessness to the extent of operation of the MCSC, cashlessness compelled cessation of service on the balance of the system.
 
 
 27
 Cashlessness of a railroad exists under the following conditions:
 
 
 28
 (1) the trustee "after all reasonable efforts . . . was faced with an imminent depletion of cash that would make it impossible for him to pay current bills for wages, supplies, interline balances, and similar expenses, and still leave an amount sufficient to permit an orderly liquidation." Penn Central, 384 F.Supp. at 919, n.31;
 
 
 29
 (2) the railroad is unable to obtain other funds without significantly threatening the interests of secured and unsecured creditors; and
 
 
 30
 (3) there are insufficient funds made available by governmental bodies to allow the railroad to continue in existence.[7] Valuation Proceedings, 439 F.Supp. at 1375-77.
 
 
 31
 Because the railroad was on the verge of cashlessness, it was inevitable that all of the Debtor's operations would cease regardless of any interest of the public in continued service by the Debtor. The only possibility of avoiding cashlessness was that of borrowing on trustee certificates. Just as the statutory scheme entrusts the abandonment determination (absent cashlessness) to the ICC, the Bankruptcy Act gives the reorganization court discretion to determine whether, and under what conditions, trustee certificates shall issue. In the desperate circumstances shown by this record, it was within the power of the district court to authorize certificates on the condition that their proceeds be used only in maintaining service on those portions of the system which the court might find had a reasonable likelihood of being reorganized.
 
 
 32
 The evidence before the district court justified its conclusion that the two aims of the Bankruptcy Act regarding railroad reorganizations would best be served by allowing priority borrowings by the Trustee, but restricting their use to that portion of the Milwaukee Road which has a significant possibility of successful reorganization.[8] This course of action would, of course, have had the effect of a discontinuance and would have, absent the imminent cashlessness of the railroad, been an impermissible usurpation of ICC authority. It is permissible here only because the trustee certificates were the only source of cash available to an otherwise cashless railroad.
 
 
 33
 Thus we conclude that the district court, rather than denying the embargo order, should have limited the use of the then unexpended borrowed funds to MCSC or some similar segment or at least should have so limited the use of the $20,000,000 further borrowing. Authorization of an embargo would have been an orderly procedure to recognize the compelled cessation of service everywhere except on the segment for the operation of which funds were borrowed.
 
 
 34
 Accordingly, we (1) affirm the order of May 10, 1979 authorizing the $15,000,000 borrowing; (2) vacate the order of June 1, 1979 denying the embargo; and (3) modify the order of June 19, 1979 authorizing the $20,000,000 borrowing so that any funds remaining unexpended shall be used to provide service over MCSC or some similar segment to be defined by the district court. The cause is remanded for further proceedings and the entry of further orders consistent with this opinion. The time for issuance of the mandate of this court is shortened to seven (7) days after the filing of this opinion and the mandate shall then issue. Each party shall bear its own costs on appeal.
 
 
 
 *
 One of the judges originally assigned to the panel was unavoidably absent when the time for argument arrived. Circuit Judge Tone was then assigned to the panel and heard oral argument. After oral argument a fact which Judge Tone deemed disqualifying came to his attention, and he did not participate further
 
 
 [1]
 A new Bankruptcy Act went into effect October 1, 1979. There is no dispute regarding the applicability of the prior Act to this appeal. All citations to the Bankruptcy Act are to the prior statute
 
 
 [2]
 Richard B. Ogilvie was appointed successor Trustee by order of the district court on July 24, 1979
 
 
 [3]
 The Trustee petitioned on April 16, 1979 for approval of a $15,000,000 borrowing by trustee certificates. On April 23, the Trustee petitioned for the embargo to be effective May 8. At a May 4 hearing on these matters, the district court indicated it would approve the $15,000,000 borrowing to keep the entire railroad in operation (Orders No. 166 and 166A, dated May 10, 1979). At this hearing the Trustee changed the effective date of the requested embargo to May 31; according to the district court, the postponement of the requested embargo dates was "in response to the urging of the Interstate Commerce Commission and connecting rail carriers in order to facilitate directed service by such carriers over embargoed lines in accordance with 49 U.S.C. § 11125." Under this statute, the Interstate Commerce Commission (hereinafter ICC or Commission) has the authority, under specified conditions, to order another carrier for up to 240 days to provide service at government expense over lines not being operated by a carrier otherwise required to do so. After further hearings, the district court denied the Trustee's embargo petition on June 1 (Order No. 158A). On May 4, upon the court's approval of the $15,000,000 borrowing for operation of the entire Milwaukee Road, the Trustee requested authority to borrow a further $20,000,000 by trustee certificates, which would be needed at the end of May. That borrowing request was approved by the district court on June 19 (Order No. 167A). Because the requested embargo had been rejected, the proceeds of that borrowing, like those from the earlier one, were authorized to be spent on the entire Milwaukee Road
 
 
 [4]
 The Indenture Trustees represent secured and unsecured creditors owed more than $218,000,000 by the Milwaukee Road. The total debts of the Milwaukee Road amount to $420,000,000
 
 
 [5]
 The Plan of Reorganization was filed with the court by the Trustee on August 10, 1979
 
 
 [6]
 Whether the term "embargo" was technically appropriate is not clear. The term usually refers to an involuntary discontinuance of some portion of a railroad's services as a result of a flood or some other natural disaster. Pennsylvania v. Penn Central Transportation Co., 348 F.Supp. 28 (M.D.Pa.1972); Asbury v. Chesapeake & Ohio Railway, 264 F.Supp. 437 (D.D.C.1967); Myers v. Arkansas & Ozarks Railway Corp., 185 F.Supp. 36 (W.D.Ark.1960)
 
 
 [7]
 Proposals for Congressional action to keep the Milwaukee Road operating have been considered, but none has been adopted
 
 
 [8]
 The court takes judicial notice of District Court Order No. 220A, No. 77-B-8999 (N.D.Ill., Sept. 27, 1979) (allowing further borrowings by the Trustee for use only in conjunction with an embargo). The portion ordered to be continued in operation (Milwaukee II plus four modifications) differs from the lines in the MCSC, proposed in the matter currently before this court. This court, therefore, does not restrict its decision to the specific boundaries of the embargo proposal made in May, 1979