**In re CHICAGO, MILWAUKEE, ST. PAUL AND PACIFIC RAILROAD COMPANY, Debtor.**

**Consolidated joint appeals of: CHICAGO, MILWAUKEE, ST. PAUL AND PACIFIC RAILROAD COMPANY, as Debtor, and Chicago Milwaukee Corporation, as Shareholder.**

**Nos. 79–2444, 80–1425.**

United States Court of Appeals, Seventh Circuit.

Argued Dec. 3, 1982.

Decided Feb. 16, 1983.

Rehearing and Rehearing En Banc Denied April 21, 1983.

Certiorari Dismissed July 8, 1983.
See 103 S.Ct. 3574.

Jerome B. Simon, Maun, Green, Hayes, Simon, Murray & Johanneson, Saint Paul, Minn., for appellants.

Robert H. Wheeler, Isham, Lincoln & Beale, Chicago, Ill., for trustee.

Alan E. Kleinburd, U.S. Dept. of Justice, Washington, D.C., for United States.

Before WOOD and ESCHBACH, Circuit Judges, and SWYGERT, Senior Circuit Judge.

SWYGERT, Senior Circuit Judge.

This appeal represents yet another installment in the saga of the Chicago, Milwaukee, St. Paul and Pacific Railroad's ("Milwaukee Road") reorganization proceedings.[1] The shareholders seek a declaration that nearly sixty million dollars in certificates of indebtedness held by the Milwaukee Road are invalid. According to the shareholders, these certificates are invalid because they were issued pursuant to a federal statute which violates the constitutional requirement of uniform bankruptcy laws, art. I, § 8, cl. 4, and due process, equal protection, and separation-of-power principles. Because important facts will not be known until there are further proceedings below, we dismiss this appeal because the action is not ripe for review.

I

The facts pertinent to the shareholders' claims begin in the spring of 1979 when the Special Master concluded that the entire Milwaukee Road system would never be reorganized as a single system. The Special Master determined that some parts could be reorganized as a viable rail carrier and other segments could be sold for continued rail operation to third parties. In August 1979 the court-appointed Trustee ("Trustee"), aided by the Special Master's report, concluded that a midwestern "core" system consisting of three thousand miles of rail track (approximately one-third of the entire Milwaukee Road system) could be reorganized into a viable rail carrier. The balance of the Milwaukee Road's tracks was dubbed the "non-core" lines.

In the fall of 1979 the district court ("Reorganization Court") found that the Milwaukee Road was approaching a condition of cashlessness—a condition which exists if a railroad has insufficient funds to pay its employees and suppliers, thus preventing an orderly liquidation. If such funds are not available under terms fair to the estate, the railroad simply cannot operate. *Matter of Chicago, Milwaukee, St. Paul and Pacific Railroad*, 611 F.2d 662, 669 (7th Cir.1979) *(per curiam) ("Embargo Decision"); In re Valuation Proceedings*, 439 F.Supp. 1351, 1375–77 (Sp.Ct.1977). Because of the Milwaukee Road's impending cashlessness, the Reorganization Court, on September 27, 1979, ordered that operations on the Milwaukee Road's non-core lines be embargoed as of November 1, 1979.

The partial embargo order authorized the Trustee to borrow funds to support continued operations on the core lines. On October 10, 1979 the Trustee sought guarantees from the federal government of $30 million in loans, pursuant to the Emergency Rail Services Act of 1970 ("ERSA"), 45 U.S.C. §§ 661 *et seq.*

Here we must present a brief legislative history of the oft-amended ERSA which authorizes the Secretary of Transportation ("Secretary") to issue guarantees of loans necessary for continued operations of railroads. As originally enacted ERSA provided that the Secretary could not guarantee the loans unless he found, *inter alia*, "that the probable value of the assets of the railroad in the event of liquidation provides reasonable protection to the United States." 45 U.S.C. § 662(a)(6) (1976). ERSA also required that repayment of these loans "must be treated as an expense of administration of the reorganization and receive the highest lien on the railroad's property and priority in payment under the Bankruptcy Act." 45 U.S.C. § 662(c) (1976). The high priority requirement, section

1. The Milwaukee Road filed a petition for reorganization in the United States District Court for the Northern District of Illinois on December 19, 1977, pursuant to section 77 of the Bankruptcy Act, 11 U.S.C. § 205 (1976) (repealed effective 1979). These proceedings continue to be governed by section 77. Pub.L. No. 95–598, § 403, 92 Stat. 2683. This court has previously reviewed other aspects of the reorganization proceedings. *See, e.g., Matter of Chicago, Milwaukee, St. Paul and Pacific Railroad*, 673 F.2d 169 (1982); 658 F.2d 1149, *cert. denied*, 455 U.S. 1000, 102 S.Ct. 1632, 71 L.Ed.2d 867 (1982); 654 F.2d 1218 (1981); 648 F.2d 1261 (1981); 641 F.2d 482 (1981); 632 F.2d 45 (1980); 624 F.2d 1105 (1980) (Nos. 80–1426, 80–1473, 80–1474) (unpublished order), *aff'g*, 471 F.Supp. 964 (N.D.Ill.1979), 611 F.2d 662 (1979) *(per curiam)*; 585 F.2d 254 (1978).

662(c), was repealed as part of the Bankruptcy Act of 1978. Pub.L. 95–598, Title III, § 333, Nov. 6, 1978, 92 Stat. 2679, 45 U.S.C. § 662 (Supp. II 1978). The repeal "permit[s] the United States to finance an insolvent railroad on less than a first lien position. [It] is not intended to mean that the U.S. Government should bail out insolvent railroads. Rather, in the event the Secretary desires to finance an insolvent railroad in a case in which a first lien would be disasterous [sic] to efforts to reorganize the railroad, the Secretary is given discretion to accommodate the public interest." Statements by the Hon. Don Edwards, Chairman of the Subcommittee on Civil and Constitutional Rights of the House Committee on the Judiciary, and the Hon. Dennis DeConcini, Chairman of the Subcommittee on Improvements in Federal Machinery of the Senate Committee on the Judiciary, upon introducing the [final version of the Bankruptcy Act of 1978], 124 Cong.Rec. 32411, 34011 (1978), *reprinted in* 1978 U.S. Code Cong. & Ad.News 6486, 6555–56. A month later, on November 8, 1978, Congress further eased ERSA restrictions by permitting the Secretary to waive the finding that the probable value of the assets would provide reasonable assurance of repayment. Pub.L. 95–611, § 3(b), 92 Stat. 3089, 45 U.S.C. § 662 (Supp. II 1978).

This was how the law stood on October 10, 1979 when the Trustee sought ERSA guarantees for loans for core lines' operations after November 1. It is unclear from this record whether the Secretary would have issued these ERSA guarantees at a priority below a first lien. It is reasonably clear, however, that the ERSA guarantees (for core lines' operations) would have had a priority senior to the shareholders' interests.

One consequence of the partial embargo was that it prematurely curtailed the opportunity of two bidders (an association of Milwaukee Road employees and a coalition of employees, shippers, and states) for the railroad's non-core assets. Once a portion of the Milwaukee Road was embargoed, it could not be revived. The embargo meant, therefore, that there was insufficient time for completion of the lengthy Interstate Commerce Commission ("ICC") proceedings considering the bidders' proposals.

On October 12, 1979 the President approved H.J.Res. 412, Pub.L. No. 96–86, 93 Stat. 656 (1979), which required the Secretary to provide ERSA funds to support the operations of both the core and non-core lines. Section 115(a) permitted the Secretary to waive many of the ERSA restrictions and to issue certificates "with such priority in payment as the Secretary deems appropriate to secure repayment[.]" The Trustee immediately commenced negotiations with the Secretary concerning the priority of the debt necessary to operate the entire railroad. The Secretary, however, refused to issue the guarantees unless they had a priority senior to the interests of secured and unsecured creditors because in his judgment a lower priority would not assure repayment. On October 26, 1979 the Reorganization Court concluded that guarantees at this high priority would injure the interests of the creditors and, therefore, could not be authorized.

The Reorganization Court's order specifically discussed what congressional action would permit authorization of loans to operate the non-core lines. The court indicated that such debt must be subordinate to the interests of secured and unsecured creditors. Unpublished Order No. 220E at 2 (Oct. 26, 1979). Additionally, the court expressed its concern for the shareholders' interests, indicating that government grants were more appropriate than federally-guaranteed loans. *Id.* at 5. The embargo of the non-core lines began on November 1, 1979.

Responding directly to the crisis of the embargo, to the premature curtailment of the two bidders' opportunity to acquire the non-core lines (a possibility seemingly beneficial to the Milwaukee Road estate), and to the Reorganization Court's concerns for the creditors and shareholders, Congress enacted the Milwaukee Road Restructuring Act ("MRRA"), 45 U.S.C. §§ 901–22 (Supp. IV 1980), on November 4, 1979. MRRA, *inter alia:*

(1) required the Trustee to maintain service on the core and non-core lines as it existed on October 15, 1979 until certain events occurred, § 920(a);

(2) required the Secretary to provide a ten million dollar grant to the Trustee for the purpose of financing operations on the Milwaukee Road, § 906(d);

(3) required the Secretary to guarantee certificates pursuant to ERSA to cover the Milwaukee Road's expenses in excess of revenue incurred during the MRRA-mandated period of service, §§ 906(a), (b);

(4) provided that ERSA-guaranteed certificates be subordinate to the claims of all creditors of the Milwaukee Road, § 906(c);

(5) provided for expedited ICC consideration of employee or employer-shipper ownership plans, § 905;

(6) provided the Trustee with a less costly means of settling the potential liabilities associated with traditional labor protection benefits for employees terminated as a result of restructuring or reductions in service, § 908;

(7) allowed the Trustee to more quickly convert unneeded assets to cash which could be invested at high rates of return, §§ 903, 904.

To summarize, in return for continued service on the non-core lines, the Milwaukee Road estate and the shareholders received at least the following benefits. First, debt related to *both* the operations of the core and non-core lines was subordinated to the interests of secured and unsecured creditors. Second, the estate received a ten million dollar grant. Third, the estate received a substantial reduction in its labor protection liabilities. *See Matter of Chicago, Milwaukee, St. Paul & Pacific Railroad,* 658 F.2d 1149, 1157–60 (7th Cir.1981), *cert. denied,* 455 U.S. 1000, 102 S.Ct. 1632, 71 L.Ed.2d 867 (1982) (MRRA legislative history indicates that the Act was designed to provide affordable method of employee protection which would not totally erode assets of estate. 658 F.2d at 1158); *Embargo Decision, supra,* 611 F.2d at 665 (labor protection claims might amount to hundreds of millions of dollars). Fourth, the estate could liquidate assets much more quickly than under prior law, and the estate received expedited ICC consideration of restructing proposals. *See Matter of Chicago, Milwaukee, St. Paul and Pacific Railroad Company,* 641 F.2d 482, 487 (7th Cir.1981).

Following passage of the MRRA the Milwaukee Road's non-core lines operated from November 4, 1979 through March 1, 1980. Operations continue on the core lines. No bidder received ICC approval for acquisition of the non-core lines, and MRRA low priority funds were no longer available.

Finally, on October 14, 1980, Congress amended the MRRA. Section 701(c)(1) of the Staggers Rail Act of 1980, Pub.L. No. 96–448, 94 Stat.1961, 45 U.S.C. § 906(e) (Supp. IV 1980), provides that the MRRA-related indebtedness associated with the core and non-core lines service will be forgiven if the Milwaukee Road is reorganized as an operating rail carrier, or if substantially all of its rail assets are purchased as operating properties.[2] Thus the estate received the potential benefit of complete forgiveness of debt related to the operation of

---

2. Section 701(c)(1) of the Staggers Rail Act of 1980 provides in pertinent part:

Section 7 of the Milwaukee Railroad Restructuring Act (45 U.S.C. § 906) is amended by adding at the end thereof the following new subsection:

(h)(1) All obligations to the United States or any agency or instrumentality of the United States incurred pursuant to this section by the Milwaukee Railroad or the trustee of the property of the Milwaukee Railroad shall be waived and canceled when—

(A) The Milwaukee Railroad is reorganized as an operating rail carrier; or

(B) substantially all of the Milwaukee Railroad is purchased.

(2) For purposes of this subsection, substantially all of the Milwaukee Railroad shall be considered as having been purchased when (A) more than 50 percent of the rail system operated by the Milwaukee Railroad on the date of enactment of the Staggers Rail Act of 1980 [October 14, 1980] has been purchased, and (B) more than 50 percent of the employees employed by the Milwaukee Railroad on such date of enactment have obtained employment with other rail carriers.

the core and non-core lines during the MRRA-mandated period.

Two additional facts are important. Neither MRRA-related certificates' principal nor interest is payable until the assets of the Milwaukee Road are distributed under an approved plan of reorganization. The Trustee is currently negotiating a reorganization plan which would satisfy the Staggers Rail Act forgiveness provisions.

## II

The shareholders and the Trustee have not discussed in any detail the propriety of the relief sought by the shareholders. The United States does address this question, albeit with insufficient analysis. This omission, as the following discussion indicates, cannot be ignored. Because we hold that this appeal is not ripe we do not decide to what relief the shareholders would be entitled if they ultimately prevail. Nevertheless, because the parties seem totally unaware of the ramifications of this issue and because the MRRA is unique, we take this opportunity to discuss our concerns.

The shareholders ask this court to "declar[e] that the trustee's certificates of indebtedness issued pursuant to Section 7 of the MRRA are null and void and direc[t] their cancellation." The shareholders, of course, do not maintain that the other provisions of the MRRA, provisions which benefitted the shareholders, are invalid. In effect they seek a severance of section 7 from the MRRA.

A well-settled principle of constitutional law and statutory construction is that

> the unconstitutionality of a part of an Act does not necessarily defeat or affect the validity of its remaining provisions. Unless it is evident that the legislature would not have enacted those provisions within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law.

*Champlin Refining Co. v. Corporation Commission of Oklahoma,* 286 U.S. 210, 234, 52 S.Ct. 559, 564, 76 L.Ed. 1062 (1932) (citations omitted). *See United States v. Jackson,* 390 U.S. 570, 585, 88 S.Ct. 1209, 1218, 20 L.Ed.2d 138 (1968). *See also Scheinberg v. Smith,* 659 F.2d 476, *rehearing denied,* 667 F.2d 93 (5th Cir.1981) ("The controlling inquiry in matters of severance is whether the legislature intended the offensive statutory provision to be an integral part of the statutory enactment.... [t]he question is whether the legislature would have enacted the valid portions of the statute with the unconstitutional portions stricken therefrom." 659 F.2d at 481 (citations omitted).).

Our review of the legislative history and statutory language of the MRRA indicates that it is not possible to sever section 7 of the MRRA and conclude that Congress would have enacted the remaining provisions. The MRRA can only be viewed as a *quid pro quo* in which, in exchange for continued operations of the non-core lines for a four-month period, Congress gave the estate and the shareholders benefits to which they were not otherwise entitled. Our conclusion is buttressed by the fact that the relief the shareholders seek would result in a substantial and unforeseen windfall to the shareholders at the taxpayers' expense.

If our view of the legislation is correct, the proper relief would be the restoration of the estate to the position it would occupy if the MRRA had not been passed. This position would reflect the ERSA-guaranteed loans (presumably at a higher priority) for operation of the core lines from November 4, 1979 to March 1, 1980, less the $10 million grant, and less the benefits of increased asset liquidity; reduced labor protection liability, and waiver of the entire MRRA-related debt for the core lines during the relevant period if the Staggers Rail Act forgiveness provisions apply.[3] The record does not contain sufficient information to

---

**3.** The United States argues that *all* of the MRRA debt, whether related to core or non-core operations, should be converted to high-priority ERSA loans, and the $10 million grant should be "returned" to the federal government in the event the shareholders prevail. The shareholders completely ignored this argument.

hazard a guess about this position. It is clear, however, that the injury to the shareholders caused by the passage of the MRRA is considerably less than $60 million.

## III

In deciding that this appeal is not ripe we follow the Supreme Court's reasoning in *Regional Rail Reorganization Act Cases,* 419 U.S. 102, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974) ("*3–R*"). There the Court reviewed the ripeness of each of the challenges to a federal statute which, like the statute at issue here, concerned railroad reorganization proceedings.

Noting that "ripeness is peculiarly a question of timing," 419 U.S. at 140, 95 S.Ct. at 356, the Court found that any delay in determining some of the challenges to the constitutionality of the statute would frustrate the very purpose of the statute. *Id.* at 140, n. 25, 95 S.Ct. at 357, n. 25. There are no such concerns raised by this appeal. The MRRA's purpose to maintain rail service on the non-core lines while the ICC considered third-party proposals has already been served.

One of the challenges in *3–R* found ripe for review concerned an event which was virtually certain. The *3–R* appellants argued that the provision requiring a conveyance of private rail properties to Conrail violated the due process clause of the fifth amendment.[1] The conveyance was "in no way hypothetical or speculative." *Id.* at 143, 95 S.Ct. at 358.

Here, however, the shareholders' claims are speculative and hypothetical. The shareholders are not currently suffering any concrete harm because neither the principal nor interest is being paid. There is a possibility that there will be insufficient assets remaining in the estate to satisfy the Milwaukee Road's creditors with priority senior to MRRA-related claims. There is, moreover, an excellent possibility that the entire MRRA-related debt will be forgiven as a result of the Staggers Rail Act. If either of these events occur, there will be no injury to the shareholders and they will have no case or controversy to press.

The *3–R* Court declined to review a fifth amendment challenge to the statute's valuation method because

> [w]ithout evidence of actual figures ..., a court is not able to discern 'what legal issues it is deciding,' 'what effect its decision will have on the adversaries, [or] some useful purpose to be achieved in deciding them.' *Public Service Commission v. Wycoff Co.,* 344 U.S. 237, 244 [73 S.Ct. 236, 240, 97 L.Ed. 291] (1952). Clearly the record on these issues does not yet provide the 'confining circumstances of particular situations,' *Communist Party v. SACB,* [367 U.S. 1] at 72 [81 S.Ct. 1357, 1397, 6 L.Ed.2d 625 (1961)], which best inform constitutional adjudication.

419 U.S. at 146, 95 S.Ct. at 360. *See also El Paso Building & Construction Trades Council v. El Paso Associated General Contractors,* 376 F.2d 797, 800 (5th Cir.1967); *Danville Tobacco Association v. Freeman,* 351 F.2d 832, 833–34 (D.C.Cir.1965); *Cha-Toine Hotel Apartment Building Corp. v. Shogren,* 204 F.2d 256, 257, 258–59 (7th Cir. 1953). As discussed in Part II, *supra,* the record concerning the harm to the shareholders is inadequate. We cannot determine what effect a decision would have on the adversaries. Additionally, the actual magnitude of the alleged taking is relevant to our consideration of the shareholders' due process claim. *See Embargo Decision, supra,* 611 F.2d at 666–67 (railroad's due process claim requires a balancing of interests).

In declining to decide the valuation claim, the *3–R* Court noted that "there will be ample opportunity to litigate [the] controversies after the factual record has matured." 419 U.S. at 147, 95 S.Ct. at 360. Here, too, there will be ample opportunity to challenge the MRRA once a reorganization plan has been approved and the factual record indicates precisely what, if any, harm the shareholders suffered as a result of the MRRA. We have little doubt that the shareholders will avail themselves of the opportunity.

**610**

The shareholders maintain that they are suffering a current harm because the MRRA-related certificates "cloud" the Trustee's reorganization effort. They offer no evidence that this is true, and the Trustee does not join them in this contention. Rail track assets are peculiarly illiquid. It is logical, therefore, that the estate—and the shareholders—would receive a greater benefit, even without the Staggers Rail Act forgiveness provision, in the reorganization and/or sale of the Milwaukee Road's assets for ongoing rail service. This assumption may not be correct. Certainly the shareholders may marshal proof that but for the MRRA a reorganization plan more beneficial to the shareholders would have been negotiated.

As Justice Frankfurter observed:

Justiciability is of course not a legal concept with a fixed content or susceptible of scientific verification. Its utilization is the resultant of many subtle pressures, including the appropriateness of the issues for decision ... and the actual hardship to the litigants of denying them the relief sought.

*Poe v. Ullman,* 367 U.S. 497, 508–09, 81 S.Ct. 1752, 1758–1759, 6 L.Ed.2d 989 (1961) (opinion of Frankfurter, J.). Our analysis indicates that the issues on appeal are currently unsuitable for judicial review. Future events may well render the shareholders' claims moot. Balanced against these factors is the shareholders' unsubstantiated claim that the negotiations are hampered by the cloud of the $60 million certificates. As discussed in Part II, *supra,* this cloud is probably considerably less than $60 million. Absent some showing other than these unsubstantiated assertions, we find that the alleged hardship to the shareholders does not outweigh the inappropriateness of deciding important constitutional questions on such an incomplete factual record.

The appeal is dismissed.