In re **CHICAGO, MISSOURI AND WESTERN RAILWAY COMPANY, Debtor.**

**Bankruptcy No. 88 B 5141.**

United States Bankruptcy Court, N.D. Illinois, E.D.

Aug. 24, 1988.

Daniel Murray, of Jenner & Block, Chicago, Ill., trustee.

Ross & Hardies, Chicago, Ill., for the lenders.

FINDINGS OF FACT AND CONCLUSIONS OF LAW ON THE BORROWING APPLICATION AS MODIFIED OF DANIEL R. MURRAY, TRUSTEE OF THE DEBTOR, CHICAGO, MISSOURI AND WESTERN RAILWAY

JOHN D. SCHWARTZ, Chief Judge.

The court has held a hearing on the Borrowing Application as modified filed by Daniel R. Murray, the duly appointed and acting Trustee of the Debtor, Chicago, Missouri and Western Railway Company seeking orders permitting him as Trustee to enter into several loan agreements with the State of Illinois or related entities more particularly described in these Findings of Fact and Conclusions of Law. At that hearing, the Debtor's secured Lenders, Citicorp North America, Inc. and Heller Financial Services, Inc. also made objections to any such loans. In accordance with the applicable rules, the court now makes Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

*Finding No. 1*

The railroad line owned and operated by the Chicago Missouri & Western Railway Company ("CM & W") was chartered in the late 1840's. (The CM & W is herein referred to as "CM & W", "Debtor" or "Railroad".) Passenger service commenced in the mid–1850's. Four owners have operated the line since its inception.

*Finding No. 2*

The CM & W was incorporated under the laws of the State of Illinois. It is a wholly owned subsidiary of the Venango River Corporation ("Venango"). CM & W provides common carriage between the railroad gateways of Kansas City, St. Louis and Chicago. Its line extends for over 631 miles. CM & W provides terminal services for the Illinois Central Railroad, formerly the Illinois Central and Gulf Railroad ("IC") at East St. Louis. This service includes the receipt and dispatch of road freight trains, interchange pickup and delivery, and servicing of IC motive power and rolling stock.

*Finding No. 3*

The CM & W route is the shortest route between St. Louis and Chicago. It is well engineered, having minimal curvature and few grades. As a result, the route provides for fuel efficiency and less wear and tear on railroad cars.

*Finding No. 4*

The St. Louis to Kansas City line is a sturdy railroad suitable for the type of tonnage it is currently handling, as well as for any future tonnage it is likely to handle.

*Finding No. 5*

There are four different classes of traffic served by the CM & W: (1) local traffic (*i.e.*, traffic which is loaded on at CM & W stops and unloaded at CM & W stops); (2) forwarded traffic (*i.e.*, where CM & W originates the traffic, which is then completed by another carrier); (3) receipt traffic (*i.e.*, the reverse of forwarded traffic); and (4) overhead traffic (*i.e.*, traffic that is neither loaded nor unloaded on the CM & W).

*Finding No. 6*

The CM & W serves a wide variety of customers, from commercial giants like Continental Grain and Con–Agra, that deal on a world-wide scope, down to smaller local entities.

*Finding No. 7*

The commodities the CM & W handles are primarily intermodal traffic (trailers carried on flat cars), grain, food and food products, steel, scrap, petroleum, chemicals, plastic products, and some aggregates.

*Finding No. 8*

The rail lines of CM & W were purchased in April of 1987 from the IC, together with trackage rights.

*Finding No. 9*

The purchase was funded by a loan to Venango from Citicorp North America and Heller Financial Services, Inc., (collectively, the "Lenders"). The court, for the purposes of these findings has accepted the relationship of the Lenders one to the other to mean that the knowledge of one was the knowledge of the other. Each Lender or its parent was and remains one of the free world's largest banking institutions.

*Finding No. 10*

The Lenders' original loan for the purchase of the CM & W line was $86,650,000. Venango made no more than a $55,000 equity contribution to the capitalization of the CM & W. Of the total loan, approximately $79,400,000 was designated for purchase of the IC assets, $6,800,000 for transaction expenses associated with the loan, and $500,000 for working capital. Additional subsequent loans have resulted in an indebtedness to the Lenders of approximately $100,000,000. of principal, which with interest now exceeds $107,000,000.

*Finding No. 11*

CM & W's original debt to equity ratio was between 150,000% and 200,000%, exceeding the customary debt-to-equity ratio for reporting railroads in the United States which is in the 40% range.

*Finding No. 12*

Prior to making the Loan, Lenders:

(i) recognized that "there is no junk bond or equity cushion for us to rely upon" in the event of default by the CM & W;

(ii) recognized that the intended loan was a high risk, with the possibility of high reward;

(iii) recognized that they were providing in substance the total amount of the Debtor's capitalization;

(iv) expressed concern regarding: (a) the unavailability of historical financial information on the CM & W; (b) the considerable time a workout of the loan might take;

and (c) potential competition from trucks and other railroads;

(v) recognized that although they were providing virtually all of CM & W's capitalization, they were compensated for this risk via the rights they obtained through an equity position with the Debtor's parent of over sixty percent (60%).

(vi) employed and consulted one rail consultant, Mr. Harry Meislahn; examined and reviewed a traffic study conducted by DNS Associates, a financial forecast prepared by Arthur Andersen & Company, and traffic studies and forecasts made by Woodside Consulting Group;

(vii) recognized that because CM & W was a newly formed entity, a potential existed for unanticipated problems, including cash shortfalls, traffic diversions and cost overruns;

(viii) recognized that CM & W would be exposed to competition from other railroads and other modes of transportation, that over-the-road trucks represented the greatest competition due to their speed and competitive rates, and that the continuing consolidation of the railroad industry could reduce the number of "friendly" railroad connections and increase traffic diversions away from the CM & W;

(ix) recognized that the CM & W track structure from Joliet to St. Louis was in need of repair and rehabilitation, the cost of which would be at least $7,000,000.00 over five years, and that CM & W expected to invest $30,000,000.00 in track rehabilitation;

(x) recognized that historical financial numbers corresponding to the CM & W line were not available because the IC had kept its operating records on a consolidated basis which could not be broken down by line segment, and that the limited traffic data was provided to the Lenders was for 1984, but not for 1986 or 1987;

(xi) recognized that there was no complete historical financial statement for the specific assets that became CM & W, as the IC did not maintain income statements, balance sheets, and other financial statements

relating to specific portions of their property;

(xii) recognized the risk that upon its sale, many of the CM & W's revenue sources handled at one point by the IC might be diverted or might not materialize;

(xiii) recognized that in the event of a default the time required for regulatory approval to sell all or parts of the line could result in a delay as long as two years;

(xiv) recognized that abandonment or liquidation of the CM & W would be a difficult course to pursue because of the jurisdiction of the Interstate Commerce Commission ("ICC");

(xv) recognized that in the event of bankruptcy, the court and an appointed trustee would be charged with considering the public interest in addition to the economic interests of the railroad and its creditors and shareholders;

(xvi) recognized that under the Amtrak contract, CM & W would be prohibited from disposing of or abandoning its service of Amtrak without Amtrak's permission, and that such provision effectively limited the method of liquidating the loan to a sale of the railroad as a going concern, thereby precluding the possibility of either abandoning or liquidating the railroad;

(xvii) recognized that even without the Amtrak contract, it would be very difficult to abandon or liquidate the CM & W line because of extensive ICC review and the fact that the majority of past rulings had steered away from these alternatives;

(xviii) recognized that selling segments of the CM & W as a going concern would be more realistic, quicker and more lucrative than liquidating its fixed assets;

(xix) recognized that regional railroads consistently sold higher than their net liquidation values;

(xx) recognized that Amtrak's agreement might be viewed as a revenue enhancement for the traffic it guaranteed in the event that the railroad had to be sold in the future.

(xxi) recognized that newly formed regional railroads generally enjoy lower labor costs than the Class 1 lines, and specifically, that Venango had successfully negotiated labor agreements which would reduce labor costs and provide the benefits of flexible work rules and the ability to subcontract work;

(xxii) estimated the liquidation value of the CM & W assets to be $81,442,000.

*Finding No. 13*

The original experts who predicted the revenues and profits for the CM & W at its inception failed to take into account the fact that the IC agreements virtually precluded CM & W from realizing the revenue that was being projected.

*Finding No. 14*

At the time CM & W was formed, organized labor argued that the transaction was so economically fragile it could likely lead directly to abandonment. Organized labor therefore interpreted the transaction as a thinly veiled artifice to avoid the labor protection obligations normally imposed upon a Class 1 carrier such as IC.

*Finding No. 15*

On April 1, 1988, the CM & W filed a voluntary petition under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.*,[1] in the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division. On May 11, 1988, pursuant to § 1163 of the Code, the United States Trustee for the Northern District of Illinois appointed Mr. Daniel R. Murray as Chapter 11 Trustee ("Trustee").

*Finding No. 16*

On April 1, 1988, the Lenders held a claim of not less than $107,000,000.00 against the CM & W, which claim was secured by a first priority security interest in all of its real, personal and mixed property. This claim arose initially out of a loan in the amount of $86,500,000.00 and a revolving credit agreement in the initial amount of $5,000,000.00. Those credit

---

**1.** "Bankruptcy Code" or "Code". All section (§) references, unless otherwise noted, are to the Code.

agreements were closed on April 28, 1987. Between April 28, 1987 and the date of the commencement of this case, a number of expansions of the revolving credit facility and the accrual of interest increased the Lenders' claim to $107,000,000.00. During the aforesaid period, the CM & W made one payment of principal in the amount of $35,000.00, and made no payments of interest.

*Finding No. 17*

Mr. Murray has dual responsibilities as Trustee. First, the public interest imposes an obligation to attempt to maintain continued passenger and freight service on the line. Second, Mr. Murray has an obligation to preserve and enhance the values of the property of the estate for the benefit of all its creditors and shareholders.

*Finding No. 18*

The CM & W rail line runs through the heart of the State of Illinois, including some of its richest agricultural counties and the largest corn and soybean producing counties in the country. Cessation of operations would adversely affect these areas, as the availability of the CM & W helps keep transportation costs down for agricultural communities. Cessation of operations would also have an impact on the manufacturing that takes place along the CM & W corridor, since it would impact upon the ability of these companies to bring in raw materials and ship out finished products. Cessation of operations would have an impact on well over 300,000 passengers. Many of these individuals use CM & W to avoid the higher costs of flying. State government is also dependent upon the CM & W. The approximate 140,000 riders originating from Springfield include a large number of state employees travelling between Springfield and Chicago. There is also a major university in Bloomington, whose population uses the CM & W to travel back and forth from Chicago. Railroads are "economic generators," in that they preserve and foster industries already in communities along railroad lines. The continued operation of the CM & W is also important to these communities' efforts to attract new industries.

Accordingly, the CM & W is an integral part of the transportation network of Illinois.

*Finding No. 19*

In Missouri, CM & W serves 50 cities and towns, of which 44 are served by no other railroad.

*Finding No. 20*

If the CM & W were not in operation, the Chicago to Springfield passenger trains would be cancelled, and the Chicago to St. Louis passenger trains subsidized by the State would likely be cancelled.

*Finding No. 21*

There is presently no alternative rail service to the CM & W between Chicago and Springfield; Bloomington and Springfield; and Bloomington and Joliet.

*Finding No. 22*

Alternatives to the CM & W rail route for long-distance passenger trains between St. Louis and Chicago are unsatisfactory.

*Finding No. 23*

CM & W serves approximately 1,000 shippers.

*Finding No. 24*

It is much less expensive to ship by rail, or piggyback style than by straight truck, particularly where distances exceed 200 miles. Moreover, a rail car carries as much as four tractor trailer rigs. As a result, if the estimated 8,000 monthly piggyback carloads are taken off the CM & W, 32,000 new truck loads a month will run on Illinois highways, resulting in increased expense, congestion, and hazard to the traveling public.

*Finding No. 25*

Trustee's Exhibit 49 is a list of shippers of the CM & W with no alternative railroad service. These shippers are located in 51 communities along the line from Joliet through Godfrey, from Godfrey up to Roodhouse; and from Springfield west through Granite City.

*Finding No. 26*

The CM & W has shipped 14,400 carloads of freight in the past 12 months for customers who have no other rail alternative.

*Finding No. 27*

CM & W employs approximately 450 persons.

*Finding No. 28*

It is the general policy of the State of Illinois to encourage hazardous material movements by rail, rather than by truck, because rail is inherently a much safer mode of transportation for hazardous materials. In 1984, for example, trucks carried 25% of hazardous materials in transit and accounted for 93% of the accidents involving hazardous materials.

*Finding No. 29*

Over the last decade, the rail system in the United States and in Illinois has gone through substantial contraction. Illinois has lost 3,000 miles of trackage during that period. As a result, many communities that were served by good, efficient rail freight transportation in the past are no longer served, which is to their detriment.

*Finding No. 30*

One of the reasons that Illinois has continued to grow as a state is because of its transportation assets. Its location in the country has made Illinois a transportation center from its earliest days. The railroads played an important role in the State's development, facilitating the transportation of raw material to manufacturing centers and the dissemination of agricultural products to the world.

*Finding No. 31*

The railroad system in the State of Illinois is vital to the State's health, because it supports economic development, jobs, industry, and the movement of agricultural and coal products to market.

*Finding No. 32*

Cessation of the CM & W's operations would not be in the public interest. CM & W represents the only rail transportation service for 55 Illinois communities. Loss of that rail transportation service to those communities, as well as to other communities, where other railroads do not serve particular shippers, would be a heavy blow to freight shippers in the State of Illinois.

*Finding No. 33*

The Trustee believes there is a possibility of reorganizing either the whole or a part of CM & W line on an ongoing basis as a railroad. To that end, he has employed an independent consultant, who will report within a short time, to advise him on potentially beneficial changes in operations and contractual relations with others. The Trustee has also initiated various measures designed to improve the CM & W's financial performance.

*Finding No. 34*

Funds are required to keep the CM & W operational while the Trustee explores the possibilities of reorganization. The Trustee has negotiated with potential lenders in his attempt to obtain the required funds on both a non-super-priority basis, and on a super-priority prime lien basis. The Trustee has been unable to secure funding that would not require the priming of the Lenders' lien position. A central feature of negotiations with any potential lender has been assurance of repayment · which requires priority over the Lenders' lien position.

*Finding No. 35*

The Illinois Department of Transportation ("IDOT") has pending project requests seeking a total of approximately $25,000,-000.00. Approximately $5,000,000.00 is available to fund those requests. Despite the magnitude of competing project requests, IDOT is willing to fund the three proposed CM & W programs because the CM & W programs are of higher public interest and of higher potential benefit to the State than other projects.

*Finding No. 36*

On June 30, 1988, the Illinois House of Representatives enacted Resolution No. 1690, recommending extensive financing for the CM & W by the State of Illinois because, in part, of "the critical need to maintain rail passenger service between Chicago and Springfield and the other cities on the current [CM & W] route [and the need to maintain] 400 Illinois jobs[.]"

*Finding No. 37*

On June 8, 1988, the Trustee served on the Lenders and filed with this Court his Notice of Hearing On Trustee's Motion for Authority To Incur Secured Debt ("Borrowing Application"). The Borrowing Application summarized the amount and purpose of the three IDOT grant and loans, the Department of Commerce and Community Affairs ("DCCA") loan in the amount of $1,000,000.00 and a proposed $15,000,-000.00 private loan. Copies of three of the five loan agreements and a letter of commitment for one of the other loans were included. The Borrowing Application stated that parties who wished to review the agreements in their final form should contact the Trustee's counsel. Only the Lenders requested such review. Final, revised agreements for the IDOT loans were served upon Lenders' counsel on July 13, 1988. Documentation of the DCCA loan agreement was served on Lenders' counsel on June 27, 1988. On July 15, 1988, the Trustee advised the Lenders that the originally-proposed $15,000,000.00 loan from a private source had not materialized, and that instead an $8,000,000.00 to $10,000,-000.00 loan from IDFA would be substituted. A proposed term sheet outlining the $10,000,000.00 loan, was telecopied to the Lenders' counsel on Saturday, July 16, 1988.

*Finding No. 38*

Pending Court approval, the Trustee is finalizing five State of Illinois funding programs:

1–3. From the Illinois Department of Transportation ("IDOT"), three loans or grants for improvements on the Chicago to Springfield corridor ("Amtrak loan"), the Carrollton District Improvements, and the Girard Interchange;

4. A one million dollar loan from the Illinois Department of Commerce and Community Affairs ("DCCA"); [2] and

5. A 10,000,000.00 dollar loan from the Illinois Development and Finance Authority ("IDFA").

**2.** An order was entered as respects this loan.

*Finding No. 39*

The funds for the Girard Interchange are provided through a joint federal and state program, in which the Federal Railroad Administration provides 70 percent of the funds and the state 30 percent. The Federal Railroad Administration retains a contingent interest in only that portion of the track that is constructed with their funds, so that if the track is ever abandoned and liquidated, the net salvage value of that portion of the track must be paid to the federal government through the State.

*Finding No. 40*

Under the Girard Interchange arrangement, the Illinois Department of Transportation would make a grant of up to $414,-000 to the Trustee, with no repayment obligation unless the CM & W breaches the grant's terms. The purpose of the grant is to construct an interchange track with the Burlington Northern Railroad near Girard, Illinois to allow the CM & W to continue to serve Jacksonville, Illinois. For the period ending five years after the completion of the project, the State will retain a contingent interest in materials purchased with the grant funds.

*Finding No. 41*

If the Girard Interchange grant is approved by the Court, the CM & W will not have to advance the funds necessary to construct the Girard Interchange prior to receiving reimbursement from IDOT. Instead, IDOT will make payments one month in advance based on a detailed work program.

*Finding No. 42*

Work on the Girard Interchange could be completed within two months. Construction could commence within a few weeks of the Court's approval of the grant.

*Finding No. 43*

The Girard Interchange grant would permit the CM & W to continue its service of Mobil Chemical Corporation in Jacksonville without having to make a massive investment in the Jacksonville to Murrayville trackage, the worst trackage on the railroad. CM & W earns $700,000 a year in

gross revenue from Mobil Chemical Corporation.

*Finding No. 44*

Mobil Chemical Corporation is the largest single employer in Jacksonville, with some 1,200 jobs. Mobil has projected serious impact on its industry and employees if it loses service from the CM & W. Therefore, the State is interested in retaining rail service to Mobil Chemical Corporation.

*Finding No. 45*

Under the Carrollton District Improvement loan, IDOT would make a loan to the Trustee in the amount of $860,000. Repayment would be required in fifteen equal annual payments beginning one year after the project is completed, with an interest rate of 3% per annum. The purpose of the loan is to improve approximately 40 miles of track between Roodhouse and Godfrey, Illinois so as to permit the safe and efficient movement of freight cars at a minimum speed of 25 miles per hour. The CM & W would contribute $740,000 to this project. The State will retain a purchase money security interest only in goods and materials purchased with State funds.

*Finding No. 46*

The Carrollton District Improvement loan funds are provided through Governor Thompson's Build Illinois Bond Program. Therefore, loan terms require IDOT to maintain a purchase money security interest in the rail or crossties purchased with State funds.

*Finding No. 47*

The Trustee has discretion as to the manner in which he allocates the Carrollton loan proceeds between labor and materials. It is the Trustee's intention to allocate the loan proceeds primarily to labor so as to minimize or eliminate the State of Illinois' security interest in materials.

*Finding No. 48*

If the Carrollton District Improvement work commences in August, 1988, it could be completed by June of 1989.

*Finding No. 49*

The Carrollton loan would improve safety conditions on the Railroad. A considerable amount of traffic currently transported over this line is hazardous material, including a large movement of sulfuric acid. Improving the track conditions will lessen the chances for derailments and for hazardous material spills. The State would prefer that hazardous materials not be rerouted over the Chicago to St. Louis main line because (a) it would interact with passenger traffic; and (b) the trains would have to traverse almost all of Springfield to reach the north end of town, the only location where the trains could be turned to go back out the Kansas City main line.

*Finding No. 50*

The Carrollton loan would be economically beneficial. Currently, the Carrollton District line is operating at 10 mph, rather than at previous speeds of 25 mph. Reduced speeds require more crew time, more fuel use and more time to move shipments. The alternatives for CM & W are either to make the investment to bring the line back up to 25 mph operation or to close it to through movements thereby keeping it for local traffic only. If CM & W closed the line, it would be required to reroute the through traffic up to Springfield and out the Kansas City main line, or the reverse. For every rerouted carload, 70 miles of circuitous travel is added. This would result in additional annual operating cost increase to CM & W of $400,000.

*Finding No. 51*

To the extent that the Carrollton District Improvement project puts assets into the line, value would be added to the railroad.

*Finding No. 52*

Under the Amtrak loan agreement, the Illinois Department of Transportation would make a loan of $1,661,290 to the Trustee. No interest would be charged. Repayment would not be made by CM & W, but would instead be deducted from one-third of railroad performance payments earned by the CM & W which the state would otherwise be required to pay CM & W in the future for timely operation of Amtrak trains. If the loan is not repaid by April 1, 1996, it shall be deemed repaid in full. The purpose of the loan is to improve 150 miles of main line track between mile-

post 40.0 and milepost 190.0 on the CM & W's Chicago to St. Louis main line corridor through minor rehabilitation, resurfacing and other improvements. Completed improvements would allow for safe and comfortable operation of Amtrak passenger trains at a maximum operating speed of 79 miles per hour.

*Finding No. 53*

The IDOT/Amtrak loan provides for payments by the State to be made one month in advance based on a detailed work program. At the end of the month, the next month's work program would be submitted and the previous month's would be reconciled. The CM & W would be out-of-pocket under this loan only in the event that expenditures exceed the budgeted amount for that month.

*Finding No. 54*

The IDOT/Amtrak loan is designed to meet Class 4 certification requirements (60 mph for freight trains and 80 mph for passenger trains) by eliminating slow orders and improving track structure.

*Finding No. 55*

There are three round-trip Amtrak trains daily between Chicago and St. Louis, and one round-trip daily from Chicago to Springfield.

*Finding No. 56*

The level of service currently provided to inter-city rail passengers on the Joliet to Springfield corridor is not acceptable to IDOT because the service is too slow and the ride too rough. As a result, Amtrak is losing riders and those trains are incurring greater deficits. Amtrak is therefore earning less money out of the fare box, which is costing the State of Illinois funds in increased subsidy amounts.

*Finding No. 57*

The Amtrak rehabilitation work will take approximately 180 working days to complete.

*Finding No. 58*

Under the current Amtrak agreement, to the extent that the CM & W operates Amtrak trains or facilitates the operation of those trains on-time, CM & W earns incentive performance payments. CM & W could earn up to $1.4 million per year if all eight daily Amtrak trains were operated on-time.

*Finding No. 59*

The Trustee has filed a motion to reject the Amtrak contract on the ground that it is onerous and burdensome. Were the Trustee able to rehabilitate the line and bring it up to 79 mph, the CM & W would start receiving incentive payments, which would go a long way toward changing the present onerous and burdensome impact of the contract.

*Finding No. 60*

The Trustee must consider the CM & W's potential common carrier obligations in determining whether to reject the Amtrak contract.

*Finding No. 61*

Amtrak came onto this property many years ago as a result of the Rail Passenger Service Act. Under the Act, Amtrak undertook the railroad's common carrier obligations. If Amtrak is forced to cease operations on this line, CM & W might have a common carrier obligation to conduct passenger as well as freight service over the line. This latter obligation has never been extinguished by Congress.

*Finding No. 62*

Amtrak has agreed to start the incentive payments to CM & W for timely service at timetable speed corresponding to a maximum speed of 60 mph, rather than 79 mph, on an interim basis.

*Finding No. 63*

Operating speeds on railroads are divided into four classes by the Federal Railroad Administration. Class 1 allows trains to travel up to 10 mph; Class 2 up to 25 mph; Class 3 up to 40 mph for freight and 60 mph for passenger traffic; and Class 4 up to 60 mph for freight and 80 mph for passenger traffic.

*Finding No. 64*

Maximum authorized speed for Class 4 passenger trains is 79 mph, while maximum authorized speed for Class 4 freight trains is 60 mph.

*Finding No. 65*

Class 4 condition track would permit a comfortable passenger ride at 79 mph maximum speed.

*Finding No. 66*

Class 4 certification from the Federal Railroad Administration requires that: (1) the rail be inspected ultrasonically or magnetically once a year at a cost to the CM & W of $20,000 per year; and (2) a twice weekly walking inspection, at a cost to the CM & W of $10,000 per year. For Class 4 track, each 39 foot section of track must contain at least 12 of 17 non-defective ties. For Class 3 track, no ultrasonic inspection is required and only one weekly walking inspection is required. For Class 3 track, only 8 of the 17 ties in a 39 foot section of track must be non-defective.

*Finding No. 67*

CM & W's track condition is in excess of minimum Class 4 requirements. In no case are there fewer than 15 good ties per 39 foot section.

*Finding No. 68*

There are sound commercial and economic reasons for CM & W to handle freight between Chicago, Springfield and St. Louis at Class 4 standards (60 mph for freight): (1) it will improve CM & W's ability to compete; (2) it will save CM & W money on labor, because if it is able to run up to 60 mph, CM & W will only need one train crew from Chicago to St. Louis; (3) the Amtrak incentive payments will add revenue to CM & W's financial position.

*Finding No. 69*

The ability to operate freight trains at Class 4 speed (60 mph) allows CM & W to exploit the efficiencies of its labor agreements. CM & W's employees are paid the same daily wage whether they work one hour a day or twelve hours a day. It would not be possible to use one crew to run the Chicago to St. Louis freight route at a maximum of 30 mph to 40 mph, but it would be possible to do so under Class 4 conditions. The labor savings of running one crew versus two, on a monthly basis, for just one train, in wages and fringe benefits alone, is roughly $30,000.00 per month.

*Finding No. 70*

There would be competitive disadvantages to running the trains along the Chicago to St. Louis corridor at 30 mph to 40 mph, rather than at 60 mph. Specifically, at 60 mph, it is easier for CM & W to compete with the trucking on I–55, which parallels this line.

*Finding No. 71*

If CM & W reduced the maximum speed of its freight trains on the Amtrak corridor, there would be a detrimental effect on CM & W's traffic base, its revenue and its ability to attract new traffic in the future.

*Finding No. 72*

Even though CM & W is primarily a single line railroad, it is not necessary to stop or delay freight traffic in order to permit faster Amtrak trains to run along this line. First, most freight trains are run at night. Second, there is enough line capacity to handle both passenger and freight trains without delaying freight trains. Third, there are thirteen facilities on the line to allow the freight train to get off so that the Amtrak train can pass any slower traffic. These facilities, called passing tracks, average 2.2 miles in length. It is also not necessary that a train using the passing track stop while the faster train goes by. The passing tracks are maintained to allow 30 mph speeds. Finally, CM & W has approximately 42 miles of double track available on the Chicago to St. Louis line. When the double track is combined with the CM & W's passing tracks, nearly 33% of the entire route has line capacity to permit passing between trains without delay.

*Finding No. 73*

Sixty four percent (64%) of all the scheduled manifest trains that CM & W dispatches daily have maximum authorized timetable speeds in excess of 50 mph.

*Finding No. 74*

The Illinois Department of Commerce and Community Affairs ("DCCA") is the economic development arm of the State of Illinois. DCCA works primarily with busi-

nesses that are looking to expand and create or retain jobs in Illinois. The criteria that DCCA uses in deciding whether to make a loan are the number of jobs that are going to be either created or retained, and the other items contained in the application relating to history of the company, description of the project and financial condition. The State of Illinois has determined that the proposed loan to the CM & W is consistent with DCCA's criteria for approving loans, including the creation or retention of jobs.

*Finding No. 75*

Under the DCCA loan, the Trustee will receive a $1,000,000.00 loan for working capital and track rehabilitation. The interest rate is 7% per annum. Accrued interest shall be payable commencing January 1, 1989 and shall be paid quarterly thereafter. Principal payments of $50,000.00 shall be made commencing October 1, 1991 and continuing quarterly thereafter. DCCA retains a first-position security interest in all of the CM & W's present and after acquired assets, subordinate only to liens granted under the loan by the Illinois Development Finance Authority.

*Finding No. 76*

DCCA would not have granted this loan in the absence of a first-position security interest.

*Finding No. 77*

The Illinois Development Finance Authority Board of Directors has adopted a resolution approving a $10,000,000.00 loan to the Trustee and giving the Executive Director authority to finalize the loan and execute the documentation.

*Finding No. 78*

The Illinois Development Finance Authority ("IDFA") loan would be advanced at closing into an interest-bearing escrow account, from which funds the Trustee may draw as needed. The interest rate of this loan would be 8% per annum, with interest payable quarterly and principal payable upon maturity, three years subsequent to closing. IDFA would receive a senior "super-priority" valid and perfected security interest under § 364(d) of the Code in all

fixed assets owned or leased by the borrower and all proceeds of the fixed assets. The purpose of the loan is to enable CM & W to make capital and related expenditures, to maintain and improve fixed assets and to preserve jobs for CM & W employees and shippers.

*Finding No. 79*

The CM & W will keep accurate, detailed records to indicate how the IDFA funds are spent. Any working capital shortfall or net operating losses during the period the loan is used will be funded out of operations of the Railroad.

*Finding No. 80*

The Trustee can reduce the fixed-rate interest cost of the $10,000,000.00 loan by investing the funds from the loan, and may retain any net earnings from interest rate differentials.

*Finding No. 81*

The $10,000,000.00 IDFA loan will enable the Railroad to continue operations and will give the Trustee and the CM & W staff time to attempt a restructuring of the Railroad in order to determine if continued operation is feasible. It will further allow the Trustee time to receive the recommendations of the independent consultant, Transportation & Distribution Associates, regarding possible resolution of negotiations between the CM & W and IC Industries, and to commence the restructuring of the CM & W in accordance with those recommendations. In addition, the loan would enable the Trustee to change CM & W's antiquated computer system and thereby improve the information flow, reject its current office lease and obtain less expensive quarters.

*Finding No. 82*

Borrowing money in increments smaller than $10,000,000.00 would be unsatisfactory as smaller amounts would necessarily require the Trustee and the CM & W to live "from hand to mouth", thereby frightening shippers and causing the shortened staff of the Railroad to spend too great a portion of its time in court or in preparation for court. Newspaper stories indicating imminent cashlessness create anxiety among the CM

& W's shippers, and cashlessness will become a self-fulfilling prophecy.

*Finding No. 83*

At the present time, CM & W is operating at a deficit. However, it has been improving its position. Traffic declined after the bankruptcy petition was filed, but has recovered. In June, 1988, when carloads would have been expected to decline for seasonal reasons, carloadings were stable or increased slightly. There have been and continue to be positive signs that CM & W's financial situation is improving.

*Finding No. 84*

In April 1987, when CM & W began operations, it moved approximately 4,500 revenue units of traffic. In May 1987, it moved approximately 5,000 revenue units of traffic. In June 1988, the most recent month for which CM & W has revenue unit information available, revenue units were approximately 7,300. The increase in carloadings is attributable to CM & W's intensified sales and marketing campaigns.

*Finding No. 85*

The Lenders have no opinion as to CM & W's ability to operate as a going concern if it decreases its operating expenses.

*Finding No. 86*

CM & W is currently spending $400,-000.00 to $450,000.00 a month on maintenance of way costs. If CM & W receives the funds requested, the Trustee intends to spend an additional $800,000.00 to $900,-000.00 on maintenance of way expenses in the last half of 1988.

*Finding No. 87*

The $5,000,000.00 CM & W spends per year in maintenance of way costs is substantial but respectable, relative to its track density. This amount, combined with the planned IDOT programs, should be sufficient to maintain CM & W's track in an improved condition without deterioration for more than two years.

*Finding No. 88*

In order to address the CM & W's financial problems, the Trustee has tried to accelerate the collection of accounts receivable. This and other actions have materially improved the railroad's cash position. As a result of these efforts, CM & W's cash position is approximately $2,000,000.00 ahead of the predictions made by the Trustee when he first took office.

*Finding No. 89*

Lenders' Exhibit 42 is a draft of CM & W's Business Plan. It is regarded by the Trustee as being "a very preliminary draft." Additional work would have to be done on the business plan in order for it to serve as a legitimate and governing business plan for the CM & W. There are too many assumptions that are open at this point that have to be resolved over the next several weeks and months before the Trustee can arrive at a definitive business plan for the CM & W.

*Finding No. 90*

CM & W can expect to derive increased revenues from the rejection or renegotiation of certain of its executory contracts with the IC. A substantial portion of this new business would be derived from an industrial complex located near East St. Louis known as Wood River. This new business would include chemical and aggregate traffic. There would also be some switching business that would flow to CM & W as a result of the rejection of the IC agreements. The Trustee is attempting negotiations with the IC. If successful, the Trustee will not move to reject these contracts with the IC. Either rejection or renegotiations will have a significant effect on cash flow over the next several months and could result in a cash improvement in the general range of $400,000.00–$500,-000.00 per month.

*Finding No. 91*

If the IC contracts are rejected, the projected new business comes on line, and the costs are controlled as set forth in the Business Plan projection, the Lenders' own expert cannot say that there is no possibility that the CM & W can survive.

*Finding No. 92*

Trustee's Exhibit 46 is a package of financial information prepared by CM & W for one of its potential priming lenders. It projects expected revenues for the last six months of 1988 at approximately $23,700,-

000. The assumptions that underlie that revenue projection are: (a) a continuation of CM & W's base traffic levels adjusted for seasonability; (b) an addition of new business that the marketing department has been able to identify including traffic that is already signed and traffic having at least a 90% likelihood of materializing; and (c) either the renegotiation or rejection of the IC executory agreements. The projections do not include new traffic which in CM & W's estimate has less than a 90% probability of materializing.

*Finding No. 93*

CM & W experiences seasonal fluctuations in its freight traffic. CM & W experiences its lowest traffic levels in the June–July and December periods, and the highest traffic levels in the first calendar quarter and the fall.

*Finding No. 94*

If the Trustee does not obtain the funding requested in his various borrowing applications, the CM & W will be unable to continue operations within a matter of days and all of its rail operations both freight and passenger will cease. Without funds, the Trustee would be unable to discharge his statutory responsibilities to both private and public interests. Cessation of operations would also restrict the value of the CM & W property to its lowest likely range because a shutdown would foreclose opportunities for enhancing value. Cessation of operations makes it virtually impossible to reorganize the CM & W either in whole or in part as an ongoing railroad or to provide an orderly liquidation or partial liquidation.

*Finding No. 95*

The Lenders' estimate of the current liquidation value of the collateral securing their loans to the CM & W does not rise even to that of a supposition. There is no evidence as respects the cost of "closing down" the operation of the Railroad or the amount of time it would take to dispose of its assets.

*Finding No. 96*

As a general proposition a railroad—even a railroad in a financially precarious situa-tion—is worth significantly more operating than shut down.

*Finding No. 97*

The cessation of railroad operations would have an impact on the value of a railroad to a potential purchaser or operator. On day one when a railroad ceases to operate and there is no indication it is going to continue to operate, shippers are forced to seek other means to handle their needs. Once a railroad loses a traffic base with shippers, it is difficult to retrieve or recover. In addition, because the railroad is no longer operated, it is no longer maintained. The property starts to deteriorate. For example, material is stolen, crossings may be paved over by county governments or small towns, and farmers may string their fences across the track. The end result is a railroad line that requires a great deal of repair to make it minimally operative.

*Finding No. 98*

The impact that the cessation of operations has on a railroad's value includes the following: revenue ceases, costs continue. For example, many of the employee costs continue for some period of time, since the railroad has to pay for vacations earned and for fringe benefits. Operating businesses are typically engaged in long-term commitments, which may continue for a period of time (such as lease commitments for office space, office equipment, locomotives and freight cars); in addition, ceasing operations renders it very difficult to recommence operations, as employees have been discharged.

*Finding No. 99*

If the CM & W is shut down it would negatively affect its value to a potential purchaser wanting to operate the railroad or any part thereof in two ways: first, as a shutdown railroad, the CM & W would not be functioning or producing any revenue or traffic, as potential purchasers of a railroad usually attach value to the revenue of a property. Second, if the CM & W were sold in a shutdown condition, the acquirer would discover that the Railroad is in a fire-sale posture because all of the Trust-

ee's other options, except to sell the Railroad for scrap, would have been eliminated.

*Finding No. 100*

The evidence disclosed that there is a likelihood that the value of the CM & W as a going concern, even with a negative cash flow, would exceed its value shut down. Over a reasonable period of time, a going concern value would exceed shutdown value by at least the amount of the loans sought by the Trustee.

*Finding No. 101*

CM & W possesses a real opportunity to develop new traffic which could enhance the value of the CM & W as a going concern.

*Finding No. 102*

It takes approximately six months to discern the impact of substantial measures to cut costs and increase revenues in a distressed railroad situation.

*Finding No. 103*

It takes approximately six months to make a thorough exploration of the possibility of reorganizing and to analyze the full effects of attempts to reorganize. The IDFA $10,000,000.00 loan is geared to meet that timetable.

*Finding No. 104*

During the next six months, the Trustee intends to use a portion of proceeds from the DCCA and IDFA loans as follows: rehabilitation of non-functioning locomotives in storage, $500,000.00; resolution of selected deferred maintenance problems in locomotive fleet, $200,000.00; purchase of materials for Carrollton District Improvement, $300,000.00; maintenance expenditures and other expenditures meeting the description set forth in the loan descriptions, $3,300,000.00 ($800,000.00 plus $2,500,000.00); and interest on interim loan, $200,000.00.

*Finding No. 105*

Two value-enhancing possibilities which the Trustee will explore if the loans are approved would be to sell the CM & W in whole or in part to a non-railroad, or to sell it to, or merge it with, another railroad.

*Finding No. 106*

In January 1988, the Lenders recognized that recovery of the funding provided to purchase and operate the CM & W would result from selling the CM & W and its strategic position, not from liquidation. Because of various spin-offs and purchases in progress, liquidation of the railroad may net higher proceeds 12 to 18 months from January 1988 rather than presently.

*Finding No. 107*

CM & W appears to be an attractive acquisition candidate for other railroads because its lines penetrate and serve three highly important traffic corridors—namely, Chicago–St. Louis; Chicago–Kansas City; and St. Louis–Kansas City.

*Finding No. 108*

Assuming a railroad has a strategic value to a Class 1 railroad wishing to use its corridor to extend an existing single-line, long-haul traffic, its value might be enhanced by the existence of local traffic base.

*Finding No. 109*

If the CM & W keeps running and moves to improve its maintenance of way, repair its locomotives and build its traffic, the Trustee will be in a position to explore various relationships with other railroads that would add to the current value of the CM & W. For example, because of its location, the CM & W could serve as a link for other railroads in the Chicago, St. Louis, Kansas City triangle. It could therefore serve as a toll road for other railroads to move their freight among these cities (otherwise known as "overhead trackage rights").

*Finding No. 110*

Overhead trackage rights ("OTR") is an arrangement that has revenue potential for CM & W. If CM & W entered into a good overhead trackage rights agreement, it would have a positive effect. OTR would also permit CM & W to enjoy some of the benefits of a single entity railroad.

*Finding No. 111*

The reason why CM & W has not previously explored a toll road possibility is that the Railroad has been in a crisis mode since

the bankruptcy began, and a toll road solution, akin to a lease situation, requires stability.

*Finding No. 112*

The Kansas City to St. Louis corridor has real value because there are railroads that travel to only one of these cities and significant traffic moves between those cities for east-west patterns. This presents a potential for overhead trackage rights, or a toll road or lease arrangement. The Southern Pacific may be one candidate for such an arrangement.

*Finding No. 113*

By operating under the terms of the IDOT loans, the physical assets of the CM & W will be substantially improved at very modest relative cost.

*Finding No. 114*

The three IDOT loans for right of way improvement and interchange would enhance the value of the CM & W in the event the Railroad is turned back to the Lenders for eventual liquidation, or if liquidated by the Trustee. The proceeds of these three loans would be used to improve a line, which would be valuable in the event the Lenders or the Trustee were to sell, lease or grant overhead trackage rights on the line.

*Finding No. 115*

The three IDOT loans and grants permit the CM & W to correct substantial maintenance problems. Anticipated maintenance of way expenditures of $5,000,000.00 per year should enable CM & W to sustain the quality of the improvements that will be achieved as a result of the IDOT loans.

*Finding No. 116*

Both the labor and the non-labor components of maintenance of way costs add value to the Railroad.

*Finding No. 117*

If normal maintenance of way expense is not incurred, a decrease in the operating utility of a railroad will occur.

*Finding No. 118*

One of the first things a potential purchaser considers in setting a price is how much rehabilitation needs to be performed

along a line. There is a direct benefit to having a line that is well-maintained, up in service, and without slow orders. The three track rehabilitation loans from IDOT are at below-market interest rates. Thus, rehabilitation projects will be completed in a more economical fashion than would be possible for a Class 1 carrier paying a market rate of interest.

*Finding No. 119*

A purchaser of a railroad would take into account the fact that the railroad had operated without maintenance in determining the price to pay for the railroad.

*Finding No. 120*

The condition of the track would affect the value of a railroad to a "strategic purchaser" because the dollars are spent by someone else. One of the things a Class 1 railroad purchaser would be concerned about in purchasing a railroad as a strategic asset would be how much additional money the purchaser would have to put in if it bought the asset.

*Finding No. 121*

CM & W's net operating loss was decreased from $800,000.00 to $550,000.00 by increasing revenues and decreasing expenditures.

*Finding No. 122*

All of the other railroads which connect Chicago and St. Louis (IC, NS, C & W and CSX) are Class 1 railroads.

*Finding No. 123*

CM & W has some of the most favorable labor cost agreements of any railroad in the country, with hourly pay scales, no crew districts, and no restrictions on contracting out. As volume increases, CM & W can operate at half the labor costs per unit of output of a large railroad. As a result, CM & W's value might be maximized in an overhead trackage rights arrangement, rather than through sale to a Class One railroad.

*Finding No. 124*

It is not appropriate to permit a liquidation of the Railroad or an abandonment of its operations by way of a hearing under § 364(d) of the Code and Rule 4001.

*Finding No. 125*

No application to abandon or to liquidate the Debtor has been filed by either the Trustee or the Lenders.

*Finding No. 126*

If the Trustee is unable to secure funds, the operation of the Railroad will cease and it will have to be liquidated.

*Finding No. 127*

Trustee has attempted in the short time that has been available to him to obtain funds which are required for the continued operation of the Debtor from sources other than those controlled by the State of Illinois but has been unable to do so, for, among other reasons, the extreme time pressures.

*Finding No. 128*

The Trustee is left with only the State to deal with under terms acceptable to the State or required by State law. (The Lenders have made the decision, as is their absolute right, not to extend further loans in order that the Trustee might operate the Debtor and meet his statutory obligations. Such loans would no doubt be free from many of the State's conditions.)

*Finding No. 129*

The Trustee therefore has no alternative but to meet the State's conditions if he is to have sufficient funds and time to perform his statutory obligations.

*Finding No. 130*

The evidence of the Lenders does not support a finding that the net liquidation value of the Railroad today would be greatly in excess of its going concern value even if the Railroad should achieve a positive net income from operations.

*Finding No. 131*

The Railroad has suffered operating losses each and every month since it commenced its operations in April of 1987 through May of 1988 the last reported month. The Trustee is reducing costs and expects further reductions. (Note Trustee was appointed May 11, 1988).

*Finding No. 132*

The Trustee cannot provide adequate protection to the Lenders by way of granting them a replacement lien on additional collateral, as no such additional collateral exists.

*Finding No. 133*

The Trustee's offer of adequate protection under § 364(d) of the Code is based upon the assumption that the operation of the Railroad together with the Trustee's three improvement loans, would increase the value of the Lenders' collateral by no less than the total cost of all of the Trustee's loans. As a result, the Trustee maintains that the loans would work to the benefit of the Lenders. Though this position is not without merit, it is speculative. Absent the public interest, the proposition does not, as a matter of law, satisfy the requirements of adequate protection of the Lenders' interest in the collateral. (For example, if the Debtor were a private manufacturing corporation, the offer of adequate protection made by the Trustee would be inadequate).

*Finding No. 134*

The Lenders were on April 1, 1988, the day of the commencement of this case, and at all times thereafter an undersecured lender—to wit, the value of the collateral securing the Debtor's obligations to the Lenders is less than the amount due.

*Finding No. 135*

The court deems the evidence of the Lenders to the effect that there are alternatives for customers of this Railroad to be appropriate to an abandonment or liquidation hearing, neither of which the Lenders have requested.

*Finding No. 136*

The evidence does not support a finding that as of today the Debtor has no reasonable hope of reorganization as an operating entity, either in whole or in part, nor that an orderly disposition of its assets as an operating railroad unit, again either in whole or in part, is not a possibility. However, the evidence does disclose that the continuation of this Railroad's operation is tenuous and that the Trustee's opportunity to perform his statutory duties should be limited.

## CONCLUSIONS OF LAW

*Conclusion No. 1*

This proceeding arises under Chapter 11, Subchapter IV of Chapter 11 governing railroad reorganizations. 28 U.S.C. § 1334 and 11 U.S.C. § 103(g). All Section references are to the Bankruptcy Code unless otherwise noted.

*Conclusion No. 2*

This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (D).

*Conclusion No. 3*

A bankruptcy proceeding is an equitable proceeding. This Court sits as a court of equity. *Bank of Marin v. England,* 385 U.S. 99, 103, 87 S.Ct. 274, 277, 17 L.Ed.2d 197 (1966); *Pepper v. Litton,* 308 U.S. 295, 304–05, 60 S.Ct. 238, 244, 84 L.Ed. 281 (1939); *In re Chicago, Rock Island and Pacific Railroad Co.,* 756 F.2d 517, 524 (7th Cir.1985).

*Conclusion No. 4*

A. The Trustee has moved, pursuant to § 364(d) for authorization to enter into loan agreements as Trustee secured by a lien or liens on the property of the estate senior to that of the existing lien held by Lenders. ("Borrowing Application".)

B. The Trustee's Borrowing Application requests authority to incur secured debt. Notice of hearing and supplementary filings in support of this Application satisfied the requirements of Bankruptcy Rule 4001(c).

C. Section 364(d) of the Code provides that a trustee may be permitted to incur senior secured debt if the trustee can demonstrate: (a) that the trustee is unable to obtain credit in the absence of a senior lien; and (b) there is adequate protection of the interests of the holder of the existing lien on the property on which the senior or equal lien is proposed to be granted. The trustee bears the burden of proving these elements.

D. The Trustee has satisfied the first element of the test under § 364(d)(1). After reasonable efforts, the Trustee has been unable to obtain interim financing for the Debtor absent a priming lien.

E. Section 361 of the Code provides several non-exclusive examples of adequate protection required under § 364(d)(1)(B) including: (1) requiring the trustee to make cash payments to the displaced creditor to the extent that any grant of a lien results in a decrease in the value of such entity's interest in such property; (2) providing to such entity an additional or replacement lien to the extent that the grant of a lien results in a decrease in the value of such entity's interest in such property; or (3) such other relief as will result in the realization by such entity of the "indubitable equivalent" of such entity's interest in such property.

F. The purpose of adequate protection is to protect the secured creditors from diminution in the value of their collateral. *In re Beker Industries Corp.,* 58 B.R. 725, 736 (Bankr.S.D.N.Y.1986); *see In re Reading Tube Industries,* 72 B.R. 329, 333 (Bankr.E.D.Pa.1987).

G. If the grant of a priming lien under § 364(d)(1) will not result in the diminution in value of an existing creditor's interest in the collateral, then the trustee's burden to provide adequate protection of the senior lien holder's interest under § 364(d)(2) will have been satisfied. *In re Beker Industries Corp.,* 58 B.R. 725, 736 (Bankr.S.D.N.Y.1986).

H. A trustee is not required to demonstrate with certainty that there is no possibility of a decline in the value of a creditor's collateral, nor is a trustee required to demonstrate that the existing secured creditor will receive the absolute benefit of such creditor's bargain. H.R.Rep. No. 595, 95th Cong., 1st Sess. 338–40, *reprinted in* 1978 U.S.Code Cong. & Admin.News 5963, 6295–96; S.Rep. No. 989, 95th Cong., 2d Sess. 49, 53–54, *reprinted in* 1978 U.S. Code Cong. & Admin.News 5787, 5835, 5839–40; *see United Savings Association of Texas v. Timbers of Inwood Forest Associates, Ltd.,* 484 U.S. ——, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988).

I. The Trustee's offer of adequate protection under § 364(d) of the Code is based upon the assumption that the operation of the Railroad together with the Trustee's

three improvement loans would work to the benefit of the Lenders as the value of the Lenders' collateral would be increased by the improvement loans and the continued operation of the Railroad by no less than the total cost of all of the Trustee's Loans. Though the Court has found this position is not without merit it is sepeculative and therefore does not rise as a matter of law to the requirements of adequate protection requirement of § 364(d) absent the public interest.

*Conclusion No. 5*

A. The Debtor was created pursuant to an exemption issued by the Interstate Commerce Commission ("Commission") on December 5, 1986. ICC Finance Docket No. 30911, *Chicago, Missouri & Western Railway Company—Exemption Acquisition and Operation—Illinois Central Gulf Railroad Company,* served Dec. 5, 1986.

B. The Commission has recognized that short-line railroads such as the CM & W serve the public interest by operating valuable rail service along lines that larger carriers may find unprofitable:

Transfer of a line to a new carrier that can operate the line more economically or more effectively than the existing carrier serves shipper and community interests by continuing rail service, and allows the selling railroad to eliminate lines it cannot operate economically....

[S]hortlines are dependent on local traffic for their survival, and thus have a greater incentive than class I carriers to provide local shippers with service tailored to their needs.... Shortlines frequently are able to reduce operating costs and thus keep rates competitive....

'The transfer of abandoned or underused rail property for more efficient use by a railroad can be beneficial to the shippers on the line, to the community that the line runs through, and to the selling railroad. When a transfer occurs, shippers receive continued, if not enhanced service, while the selling railroad continues to receive the feeder traffic generated by the line at its junction point with the new operator.'

We affirm this conclusion.

*Class Exemption For The Acquisition And Operation Of Rail Lines Under 49 U.S.C. 10901,* 1 I.C.C.2d 810, 813 (1985), (*quoting* Notice of Proposed Rules, 50 Fed. Reg. 34,880, at 4 (August 29, 1985), *aff'd without opinion sub nom. Illinois Commerce Commission v. ICC,* 817 F.2d 145 (D.C.Cir.1987).

C. The Commission reviewed the sale of certain Illinois Central Gulf rail lines to create the "short-line" or "regional" railroad known as the CM & W, and determined that "[t]here clearly is a major public interest in the consummation of the [CM & W sale] transaction[.]" ICC Finance Docket 30911, *Chicago Missouri & Western Railway Company—Exemption Acquisition and Operation—Illinois Central Gulf Railroad Company,* served Dec. 5, 1986.

D. This court is of the opinion that no evidence has been submitted contrary to the findings and conclusions reached by the Commission regarding the public interest in its "Class Exemption" decision. The court further believes that it should adopt the Commission's finding and the decision that make the exemption applicable to the CM & W; specifically the Commission's finding that the operation of the CM & W is in the public interest.

*Conclusion No. 6*

Lenders to railroads are deemed to have accepted the risk that, in dealing with an entity which is significantly burdened with a public interest, the Lenders' narrow private interests may be subordinated without violation of the 5th Amendment:

[The secured creditors] invested their capital in a public utility that does owe an obligation to the public.... [B]y their entry into a railroad enterprise, [the secured creditors] assumed the risk that in any depression or any reorganization the interests of the public would be considered as well as theirs.

*Reconstruction Finance Corp. v. Denver & Rio Grande Western Railroad Co.,* 328 U.S. 495, 535–36, 66 S.Ct. 1282, 1303, 90 L.Ed. 1400, *reh'g denied,* 329 U.S. 824, 67 S.Ct. 116, 91 L.Ed. 701 (1946). *See also,*

*New Haven Inclusion Cases*, 399 U.S. 392, 489–95, 90 S.Ct. 2054, 2108–11, 26 L.Ed.2d 691 (1970). In light of the pervasive history of federal regulation in the rail industry and not withstanding the Lenders' recognition of this fact prior to their commitment to finance the acquisition of CM & W, the court concludes that the allowance of the priming liens do not interfere with "distinct investment backed expectations" in such a way as to impinge upon the Lenders' constitutional rights. *Consolidated Rail Corp. v. Metro–North Commuter Railroad Co.*, 638 F.Supp. 350, 356–57 (So.Ct.R. R.R.A.1986) ("Perhaps no industry has a longer history of pervasive federal regulation than the railroad industry.") (*citing National Railroad Passenger Corp. v. Atchison Topeka and Santa Fe Ry. Co.*, 470 U.S. 451, 468–69, 105 S.Ct. 1441, 1453, 84 L.Ed.2d 432 (1985)); *see Connolly v. Pension Benefit Guaranty Corp.*, 475 U.S. 211, 226–27, 106 S.Ct. 1018, 1026, 89 L.Ed.2d 166 (1986).

*Conclusion No. 7*

Although § 1165 of the Code does not specifically direct the court and the Trustee to consider the public interest in a proceeding under § 364(d) the court concludes that public interest concerns must be considered in addition to the interests of creditors and shareholders, where the failure to permit a priming lien will result in the liquidation of the Railroad. *See In re Eureka Southern Railroad, Inc.*, 72 B.R. 813, 818 (Bankr.N. D.Cal.1987). Abandonment followed by liquidation was the substance of the Lenders' experts' testimony.

*Conclusion No. 8*

In drafting 11 U.S.C. § 1165, Congress required that the court and trustee "shall consider the public interest in addition to the interests of the debtor, creditors, and equity security holders," in ruling on, *inter alia,* the liquidation or abandonment of a railroad.

*Conclusion No. 9*

CM & W may be required as part of its common carrier charter to continue Amtrak service. (To the extent that Amtrak is not paying its share of maintenance expenses, the proper solution is to challenge the cost allocation. It is not a proper basis for refusing to allow CM & W to receive $1,661,000.00 in rehabilitation loans. *See National Railroad Passenger Corp. and Union Pacific Railroad Co., Use of Tracks and Facilities and Establishment of Just Compensation,* 348 I.C.C. 926, 942 (1977) ("under section 402(a) [of the Rail Passenger Service Act, 45 U.S.C. § 562(a) ], the Commission must set just and reasonable compensation for the access to services, tracks, or facilities it has ordered a railroad to make available to Amtrak").

*Conclusion No. 10*

Continued CM & W freight service is also in the public interest. Shippers in 55 Illinois towns rely upon the CM & W for their only rail service. These shippers and the towns in which they reside would be injured by the loss of CM & W freight service. CM & W has estimated that it served 120 customers in the past 12 months, representing over 14,000 rail carloads for shippers who have no meaningful rail alternative.

*Conclusion No. 11*

As a matter of law, the court has no right to hold an abandonment or liquidation hearing under the guise of a hearing under § 364(d) of the Code and Rule 4001 of the Bankruptcy Rules.

*Conclusion No. 12*

Priming liens are permissible in the early stages of a railroad reorganization proceeding, even if the collateral position of existing secured creditors may subsequently erode in value, so long as three conditions are present: (a) reorganization is "not clearly impossible"; (2) the new loans are "essential to the continued operation of the railroad"; and (3) the new loans will have a "direct beneficial effect on profitability". *In the Matter of Chicago, Rock Island and Pacific Railroad Company,* 545 F.2d 1087 (7th Cir.1976) (applying Section 77 of the Bankruptcy Act of 1898). *See also In the Matter of Chicago, Milwaukee, St. Paul and Pacific Railroad Company,* 611 F.2d 662, 667 (7th Cir.1979) (during initial phases of a railroad reorganization, public interest may transcend any concerns over

erosion of collateral). The evidence presented in this case by the Trustee satisfies each of these conditions.

*Conclusion No. 13*

The Court has concluded as a matter of law that by reason of the public interest the Trustee, with the approval of the Court and after a hearing, has the right, power and authority to incur debt obligations for and on behalf of this estate secured by senior liens or which are otherwise superior in priority to the rights of the Lenders to receive payment.

*Conclusion No. 14*

The interest of the Lenders which must be protected under the provisions of § 364(d) of the Code is subject to the public interest.

*Conclusion No. 15*

The Court determines that the provisions of the Code applicable to abandonment (§ 1170) or liquidation (§ 1174) and the public interest (§ 1165) which are protected pursuant to the mandate of Congress must be followed.

*Conclusion No. 16*

The Court has determined that as a matter of law it should not permit the abandonment or liquidation of this Railroad prior to permitting the Trustee a reasonable opportunity to examine the possibilities of reorganization.

*Conclusion No. 17*

Congress has manifested its special interest in rail reorganizations and the importance of considering the public interest in those proceedings in a variety of ways: (1) it has, unlike any other transportation industry, granted rail reorganizations their own special sub-part of Chapter 11 (§§ 1161–1174); (2) it requires, unlike other Chapter 11 proceedings, that a trustee be appointed to represent not only the interests of creditors and shareholders, but also the public interest (§ 1163); (3) it has retained the role of the ICC to a significant extent, particularly with respect to questions of public policy (§ 1164); and (4) it

has, in § 1165, specifically required the Court and the Trustee to "consider the public interest in addition to the interests of the debtor, creditors and equity security holders" in determining whether to order the liquidation (§ 1174) or abandonment (§ 1170) of the Railroad.

Any finding of fact may be considered as a conclusion of law to the extent appropriate, and any conclusions of law may be considered as a finding of fact to the extent appropriate.

The court has concurrently with these findings of fact and conclusions of law filed its Memorandum Opinion regarding the issues presented by the Trustee's Borrowing Application which is incorporated herein.

### MEMORANDUM OPINION

This matter is before the court on the Borrowing Application as modified of Daniel R. Murray, the Trustee ("Trustee"), to incur secured debt pursuant to § 364(d) of the Bankruptcy Code. 11 U.S.C. § 364(d).[1] The Debtor is the Chicago, Missouri & Western Railway Company (Hereafter "CM & W", "Debtor" or "Railroad"), a short-line railroad organized to take advantage of the Interstate Commerce Act Class Exemption for the Acquisition and Operations of Rail Lines under 49 U.S.C. § 10901. 1 I.C.C.2d 810 (1985). This case is therefore a railroad reorganization under Subchapter IV of Chapter 11 of the Code. §§ 1161–1174.

The Debtor, a subsidiary of the Venango River Corporation, owns and operates a 631–mile railroad which runs on two lines between Chicago, St. Louis and to Kansas City, Missouri, which it purchased along with certain trackage rights and other related assets from the Illinois Central Gulf Railroad Company, (now known as Illinois Central ("IC")), in April of 1987.

In order to fund this purchase, Debtor's parent arranged an $85,000,000 loan from Citicorp Industrial Credit, Inc. (now Citicorp North America, Inc.) and Heller Financial, Inc. ("Lenders"). A revolving credit

---

1. (Hereafter all section references are to the Bankruptcy Code ("Code"). 11 U.S.C. § 101 *et* *seq.* (1987)).

agreement in the initial amount of $5,000,-000 provided additional funds for CM & W's operations. All of Lenders' loans were secured by a security interest in all the real, personal and mixed property of CM & W. This was a highly leveraged transaction, as CM & W's parent's equity contribution did not exceed $55,000.

In making their lending decision, Lenders relied on several studies made by outside expert consultants. Those expert consultants received proforma traffic information from the IC. The IC consolidated method of financial recordkeeping did not supply revenue data for what was to become the CM & W railroad. With the information before them, all concerned, including Lenders, concluded that CM & W would be able to function as a viable entity.

This conclusion was reached in spite of the need for a substantial cash flow to service its debt and make extensive repairs to tracks and other facilities. This condition of disrepair was a fact known to all parties, including the Lenders.

Both the Interstate Commerce Commission ("ICC") and the State of Illinois concurred in this conclusion, as the transaction received both federal and state agency approval.

CM & W's purchase of the railroad and its loan agreements with the Lenders closed in April of 1987. From day one, CM & W failed to meet projections and substantial operating losses were the result. Lenders subsequently increased their revolving credit facility. On April 1, 1988, less than one year after starting out, the Debtor filed its petition for a railroad reorganization under Chapter 11 of the Code, with an indebtedness to the Lenders totaling in excess of $107,000,000.

Since the commencement of this case and the Trustee's appointment on May 11, 1988, net operating losses have continued, although lesser in amount than the average pre-petition losses.

The Trustee reports that CM & W will soon be cashless unless it can obtain outside funding. (Lenders have advised that they will not advance any further funds for the operation of the Debtor). Cashlessness would, of course, require the cessation of operations and, no doubt, the liquidation of the Debtor.

The Trustee seeks to avoid a shutdown of the Railroad by entering into a series of five loan agreements ("Trustee Loans"), the terms of which are described in more detail in the Court's Findings of Fact. The sources and purposes of those loans are:

1–3. From the Illinois Department of Transportation ("IDOT"), three loans or grants. One loan would finance track rehabilitation and improvements on the Chicago to Springfield corridor ("Amtrak Loan"); the second would provide partial funding for improvements in the Carrollton District; and the third would fund the construction of the Girard Interchange.

4. A one million dollar loan from the Illinois Department of Commerce and Community Affairs ("DCCA"), to be used for working capital, and to create or retain jobs; and

5. A $10,000,000.00 dollar loan from the Illinois Development and Finance Authority ("IDFA"), to maintain and improve fixed assets and preserve jobs for CM & W employees and shippers.

Some, if not all, of the loans have the potential of priming Lenders' lien on CM & W properties. The Trustee seeks authority to enter into these loan agreements under the Code and specifically § 364(d).

Were this a private manufacturing reorganization, the Court would proceed to determine whether the requirements of § 364(d) were met, without regard to whether the public interest provisions of the law applied. Because this is a railroad reorganization the question arises as to whether the interest, if any, of the public must be considered. The Trustee argues that priming liens are permissible because this is a railroad reorganization, wherein creditors' rights, such as those of the Lenders, are subordinated to the public interest. Under the Trustee's analysis, the court might reach its decision strictly on the basis of the public interest, even without considering § 364(d). Lenders, in contrast,

maintain that the public interest can never apply in a decision under § 364(d).

This decision is a difficult one, given the factual context of this case. The capitalization of CM & W is such that Lenders are grossly undersecured even though their lien interest is on all of the Debtor's assets. Depending on the results of continued operations, the loans could work to Lenders' detriment or to their benefit.

Lenders have obviously decided that authorization of the loans would work to their detriment, as they oppose the Application. This opposition raises a related question which could be significant in any highly leveraged financing situation. In the event a reorganization trustee is unable to meet the tests of § 364(d), may a highly leveraged lender effect a cessation of operations by opposing a motion under § 364(d)? There would be no competing creditors to demand a balancing of all creditor interests. In effect, this highly leveraged lender would make the decision the court is supposed to make. Without more, the court should perhaps dismiss such a case, as reorganization would achieve no useful purpose.

The public interest arguably provides the competing interest the court should consider in this context. Since a finding of no public interest would possibly make further inquiry unnecessary, the court addresses the public interest issue before turning to an examination of § 364(d).

### Public Interest

Whether the public interest applies to a trustee's ability to secure funds to operate a railroad, and the issues raised by that question, have not heretofore been decided in any reported case under the Bankruptcy Code. It is, as they say, a case of first impression. This is not surprising. There are not a great number of railroad reorganizations, a change for the better.

Under the old law, the Bankruptcy Act, the Supreme Court and Circuit Court decisions considered whether the rights of railroad creditors could be subordinated to the public interest. In many cases, that question was answered in the affirmative. The thrust of the public interest argument was that erosion of a lender's collateral may be permissible when denial of a priming lien precipitates the cessation of railroad operations early on in the reorganization process.

Does prior law regarding the public interest apply to an application under § 364(d)? This court will be bound by those prior decisions if the Congress's adoption of the Bankruptcy Code did not eliminate consideration of the public interest in railroad reorganization borrowings.

### The Public Interest Under the Bankruptcy Act

Under the Bankruptcy Act ("Act"), railroad reorganizations were afforded different treatment than other business reorganizations. *See* Graybeal, *Reflections on the Golden Spike: A Look at the Bankruptcy Reform Act and Railroad Reorganization*, 5 Hastings Const. L.Q. 1107, 1108–09 (1979). In order to meet the public's need for rail service, § 77 of the Act provided for railroad reorganization and made no provision for liquidation no matter what. The Supreme Court described the unique nature and concerns of railroad reorganizations as follows:

> Section 77 advances another step in the direction of liberalizing the law on the subject of bankruptcies ... A railway is a unit; it can not be divided up and disposed of piecemeal like a stock of goods. It must be sold, if sold at all, as a unit and as a going concern. Its activities can not be halted because its continuous, uninterrupted operation is necessary in the public interest; and, for the preservation of that interest, as well as for the protection of the various private interests involved, reorganization was evidently regarded as the most feasible solution whenever the corporation had become "insolvent or unable to meet its debts as they mature."

*Continental Illinois National Bank & Trust Co. of Chicago v. Chicago, R.I. & P. Ry. Co.,* 294 U.S. 648, 671–72, 55 S.Ct. 595, 604, 79 L.Ed. 1110 (1935).

"Central to the statutory objective that the reorganized company should, if at all possible, emerge as a 'living, not a dying ... enterprise,' ... is the understanding that 'a railroad [is] not like an ordinary insolvent estate.'" *New Haven Inclusion Cases*, 399 U.S. 392, 431, 90 S.Ct. 2054, 2078, 26 L.Ed.2d 691 (1970) (citations omitted).

Railroad reorganization under the Act was more often than not a protracted process, requiring hearings and formulation of a plan by the Interstate Commerce Commission, followed by hearings and bankruptcy court process of approval or disapproval with appeals following. In the event the court did not approve the plan, the process would begin again, with a referral back to the ICC for protracted reconsideration. Not surprisingly, the process of plan formulation could take decades. During that time, loss operations could continue. Against this backdrop of delay, railroad creditors often complained of mounting administrative and other priority claims. *See e.g., New Haven*, 399 U.S. at 490, 90 S.Ct. at 2108. The essence of creditors' argument was that suspension of their rights to enforce their liens constituted an impermissible taking of property under the Fifth Amendment. *Id.* at 491, 90 S.Ct. at 2109.

In a frequently cited opinion, the *New Haven* court addressed these creditor concerns as follows:

> ... security holders "cannot be called upon to sacrifice their property so that a depression-proof railroad system might be created. But they invested their capital in a public utility that does owe an obligation to the public ... [B]y their entry into a railroad enterprise, [they] assumed the risk that in any depression or reorganization the interests of the public would be considered as well as theirs."

*Id.* at 491–92, 90 S.Ct. at 2109 (quoting *Reconstruction Finance Corp. v. Denver & R.G.W.R. Co.*, 328 U.S. 495, 535–36, 66 S.Ct. 1282, 1303, 90 L.Ed. 1400). *See also Matter of Chicago, Milwaukee, St. Paul & Pacific Railroad Co.*, 611 F.2d 662, 666–

67 (7th Cir.1979); *Gibbons v. United States*, 660 F.2d 1227, 1237 (7th Cir.1981).

One commentator has restated the *New Haven* finding, concluding that subordination of creditor claims to the public interest is a foreseeable risk in railroad reorganization. Thus:

> [t]he essence of [the] argument is that the creditor, by investing in a railroad, subordinates his rights to the obligation of the carrier to serve the public and may not reclaim his funds in a manner that would jeopardize the carrier's ability to satisfy its obligation. The creditor has not waived his Fifth Amendment right to compensation for any public taking of his estate. Rather, he has so aligned himself with the carrier that during bankruptcy reorganization, when the railroad's continued ability to serve the public is most in doubt, there is no taking of the creditor's estate absent the unlawful demand that the railroad itself continue operation. The creditor's loss is instead characterized as the realization of a foreseeable risk.

Graybeal, *Reflections on the Golden Spike*, at 1126. The public interest was therefore a factor to be considered in questions involving creditor rights. On the other hand, there was a point at which the taking became unlawful, or unconstitutional.

Despite strong language regarding the public interest, Act cases did not always find the public interest to be prior to creditor rights. Cf. *In re Penn Central Transportation Co.*, 494 F.2d 270 (3rd Cir.1974), *cert. denied sub nom. United States v. Bankers Trust Co.*, 419 U.S. 883, 95 S.Ct. 147, 42 L.Ed.2d 122 (1974); *Matter of Boston and Maine Corp.*, 62 B.R. 39 (D.Mass. 1983). However, some impairment of creditor interests was generally permitted in the early stages of reorganization, when it was still premature to assess the feasibility of reorganization. Two cases in this Circuit have elaborated on that principle as follows:

> The private claims of the stockholders and security creditors and the public interest in continued railroad service have

been reconciled by a line of cases holding that while a railroad cannot be ordered to continue operations indefinitely, it may be ordered to continue service for a reasonable time while the reorganization court and the Commission act on petitions for abandonment and consider alternatives in the public interest.

*Matter of Chicago, Milwaukee, St. Paul & Pacific Railroad Co.*, 611 F.2d at 667.

. We do not believe that the Fifth Amendment requires the trustee to show [a likelihood of successful reorganization in the very early stages of a reorganization proceeding] either. The due process clause of the Amendment is not violated by anything less than actual impairment of a creditor's security.

*Matter of Chicago, Rock Island & Pacific Railroad Co.*, 545 F.2d 1087, 1090 (7th Cir.1976). The *Rock Island* district court had based its allowance of priority borrowing on three determinations: (1) that reorganization was not clearly impossible; (2) that the loans in question were essential to the continued operation of the railroad, and (3) that the loans would have a "direct beneficial effect on profitability." *Id.* at 1091. In the presence of all these conditions, some impairment of creditor rights was permissible during the early stages of reorganization.

Such was the status of the law in this Circuit under the Act. The question now arises as to whether the Code changed these principles.

*The Public Interest Under The Code*

The Supreme Court has established the following for determining whether decisions under the Act have continuing vitality under the Code:

The normal rule of statutory construction is that if Congress intends for legislation to change the interpretation of a judicially created concept, it makes that intent specific ... The Court has followed this rule with particular care in construing the scope of bankruptcy codifications.

*Midatlantic National Bank v. New Jersey Department of Environmental Protection*, 474 U.S. 494, 106 S.Ct. 755, 759–60, 88 L.Ed.2d 859 (1986) (citation omitted); *Kelly v. Robinson*, 479 U.S. 36, 107 S.Ct. 353, 359, 93 L.Ed.2d 216 (1986); *accord United Savings Association of Texas v. Timbers of Inwood Forest Associates, Ltd.*, —— U.S. ——, 108 S.Ct. 626, 634, 98 L.Ed.2d 740 (1988). Applying that rule·in this case, the court would be obligated to consider the public interest in a priming lien situation, absent express Congressional intent to the contrary.

That analysis is made more difficult in this case, as the Code made major changes in the railroad reorganization proceedings. Lenders maintain that one of those changes is the elimination of the requirement that the public interest be considered in decisions involving priming liens.

As stated previously, there have been no reported decisions involving the public interest under § 364(d). Therefore, the court must analogize from other changes affecting the public interest in railroad reorganization. From the court's perspective, the Code effected three changes which might be said to diminish the role of the public interest in railroad reorganizations. These are: (1) the restructuring of the ICC's role in reorganization; (2) the addition of a provision for liquidation; and (3) incorporation of the railroad reorganization provisions into the general Code scheme of business reorganization. Although most of the discussion in this case centers on the third change, the court briefly addresses each one.[2]

The Code effected a major restructuring in the respective roles of the ICC and bankruptcy courts. As stated in the legislative reports:

The incorporation of railroad reorganizations into the general reorganization provisions of the bill eliminates the cumbersome and duplicative procedure of

---

**2.** These changes are also addressed with great common sense in the previously cited law review article, which the court finds highly persuasive. Graybeal, *Reflections on the Golden Spike*, 5 Hastings Const.L.Q. 1107 (1979).

section 77 under which plans of reorganization shuttled back and forth between the Interstate Commerce Commission (the "Commission") and the courts and proceedings were inevitably more time consuming and expensive. Under the bill, the bankruptcy court, rather than the Commission, assumes the primary responsibility for the reorganization proceeding. However, since a plan of reorganization for a railroad may propose changes in transportation patterns or operation by, among other things, granting operating rights over, or transferring, the debtor's rail lines, the bill retains the Commission's jurisdiction with respect to such proposals. The subchapter requires that such proposals be referred to the Commission for its approval, disapproval, or modification and requires the reorganization court to give binding effect to the Commission's findings on such aspects of a plan. The subchapter also specifies that the trustee is subject to the Interstate Commerce Act, and to lawful orders of the Interstate Commerce Commission, the Department of Transportation, and State or local regulatory bodies, with court approval required if the orders require the expenditure of money, except for the payment of interline freight and passenger accounts and per diem accounts (including incentive per diem) for which no court approval is required.

.    .    .    .    .

In the case of a railroad being administered under title 11 the necessity to stem the bankrupt carrier's cash drain requires expeditious treatment of abandonment applications. The subchapter provides that the court rather than the Commission has the authority to authorize abandonments or discontinuances of rail service. After filing of the applications by the trustee with the Commission, the court establishes a time period within which the Commission must report its findings to the court. The Commission in its advisory role before the court represents the "public interest," while the trustee and creditors represent the interest of the debtor's investors. The court

may authorize abandonments if it finds the abandonment is consistent with the "public interest" and in the best interest of the estate, or essential to formulation of the plan.

S.Rep. No. 95–989, 95th Cong., 2d Sess. 11–12, *reprinted in* 1978 U.S.Code Cong. and Ad.News 5787, 5797–5798.

Notably, the Code retains ICC regulatory jurisdiction over operations of the debtor, as well as over transportation decisions involving the transfer of lines. *See* §§ 1166 and 1172(b). Although the ICC is no longer responsible for plan formulation under § 1172, and plays only an advisory role in abandonment under § 1170, it does not follow that the public interest is no longer to be considered. The Code explicitly requires application to the ICC in abandonment proceedings, as well as a hearing and notice to affected shippers and communities. *See* § 1170. Given these procedural requirements, it is clear that the restructured role of the ICC did not and was not intended to do away with public interest considerations in railroad reorganizations.

The Code also departs from the Act in its recognition that liquidation, rather than reorganization, may sometimes be the preferable alternative. This proposition is reflected in § 1174, which allows parties in interest to petition for liquidation, and which sets a five-year limitation for confirmation of a plan. The effect of these two provisions is to lessen delay and the resultant constitutional concerns voiced by creditors under the Act.

This increased protection of creditor rights under § 1174 shows Congressional concern regarding some of the Constitutional problems raised by Act cases. The fact that Congress provided this mechanism for aggrieved creditors does not, in this court's view, mean that the public interest should not be considered. The better interpretation is that the public interest should be considered, but in a more limited way than under the Act.

The language of § 1165 confirms the conclusion that the public interest is still to

be considered under the Code. Section 1165 provides that:

> In applying sections 1166, 1167, 1169, 1170, 1171, 1172, 1173, and 1174 of this title, the court and the trustee shall consider the public interest in addition to the interests of the debtor, creditors, and equity security holders.

All the Code sections enumerated in § 1165 are found in the railroad reorganization provisions of Subchapter IV of Chapter 11. Section 364(d), on the other hand, is neither listed in § 1165, nor found in Subchapter IV. The position of these sections within the Code brings this discussion to the third major Code change, which is the incorporation of railroad reorganization provisions into the general scheme of reorganizations covered by Chapter 11. Each party attaches different significance to the location of § 364(d) within the Code.

The Trustee would attach no importance to § 364(d)'s placement outside Subchapter IV. The Trustee maintains that the public interest clearly applies to applications under § 364(d), as denial of the applications will leave the estate without funds. In view of that possibility, the Trustee argues that this § 364(d) proceeding is the functional equivalent of an abandonment proceeding under § 1170. If a proceeding under § 1170, § 1165 would clearly require consideration of the public interest. In support of this proposition, the Trustee cites a recent case which used similar reasoning in finding that a proceeding to lift the § 362(a) stay in order to repossess assets of the Debtor required consideration of the public interest. *In re Eureka Southern Railroad, Inc.*, 72 B.R. 813, 818–19 (Bankr.N.D.Cal.1987).

The Lenders, on the other hand, rely on a case which found that cessation of operations due to cashlessness is not an abandonment within the meaning of § 1170. *In re Auto–Train Corp.*, 11 B.R. 418, 425 (Bankr.D.C.1981). In addition, Lenders would appear to invoke a rule of construction to support their contention. "… '[E]xpressio unius [est] exclusio alterius [ ],' which means that the expression or inclusion of one thing implies the exclusion of others." 2A Sutherland, *Statutory Construction* §§ 45.14, 47.23 (4th ed. 1984). Lenders stress the fact that § 364 is not one of the sections enumerated in § 1165. As a consequence of that omission, the Lenders conclude that the court may not consider the public interest in this proceeding.

Both parties' arguments allude to the imminent cashlessness of the estate. This Court believes, however, that that fact only highlights the need for funds to maintain the operation of the Railroad. It has no relevancy to the question of public interest.

■ Both legislative history and principles of statutory construction support the conclusion that the public interest applies to an application under § 364(d) in a railroad reorganization.

Under the Act, the counterpart of § 364(d) would be found in § 77(c)(3). 11 U.S.C. § 205(c)(3) (1979). That section allowed the court to authorize the issuance of trustee certificates, which would give holders priority over other creditors. As § 77(c)(3) was part of the overall provision for railroad reorganization, there was little doubt that courts might consider the public interest. Section 77(c)(3) and other portions of § 77 were, to some extent, duplicative of other reorganization provisions outside the railroad context.

The legislative history of the Code indicates an intent to simplify existing reorganization provisions. Given this intent, it is logical that provisions relating to priming liens would be incorporated into a single section, § 364(d). The Senate Report describes this intent as follows:

> Under the bill, the often complex and time consuming dichotomy between railroad and other business reorganizations is eliminated by incorporating railroad reorganizations into the pattern of business reorganizations generally, and including in subchapter IV only those additional provisions which are necessary to reflect the special characteristics of railroad reorganizations.

S.Rep. No. 95–989, 95th Cong., 2d Sess. 11, *reprinted in* 1978 U.S.Code Cong. and Ad. News 5787, 5797. Significantly, the Report

suggests that only those reorganization provisions *unique* to railroads are incorporated in Subchapter IV. Sections common to reorganizations generally are not included. This court does not interpret this restructuring as requiring a wholesale rejection of case law interpreting the sections moved to other parts of the Code.

Although the public interest directive in § 1165 lists only sections included in Subchapter IV, the related Senate Report addresses sections not included in the subchapter:

Section 1165 requires the court in consideration of the relief to be granted upon the filing of an involuntary petition, to take into account the "public interest" in the preservation of the debtor's rail service. This is an important factor in railroad reorganization, which distinguishes them from other business reorganizations. Hence, this section modifies the provisions in section 303 and 305 that govern generally when the business of a debtor may continue to operate, when relief under the Act sought should be granted, and when the petition should be dismissed.

S.Rep. No. 95–989, 95th Cong., 2d Sess. 133, *reprinted in* 1978 U.S.Code Cong. and Ad.News 5787, 5919. The Report's reference to §§ 303 and 305 indicates that the scope of the public interest reference under § 1165 was not intended to limit the public interest inquiry to Subchapter IV. Although not a mandatory consideration, the public interest is a "modifying" factor in decisions under sections outside Subchapter IV.

This court believes that principles of statutory construction also support its conclusion. Notably, § 1165 provides that the courts *"shall* consider the public interest" (emphasis added). The word "shall" ordinarily connotes a command. *Escoe v. Zerbst,* 295 U.S. 490, 493, 55 S.Ct. 818, 820, 79 L.Ed. 1566 (1935). Because of this mandatory language, the court may not forego consideration of the public interest in major reorganization decisions, such as plan formulation and confirmation, abandonment and liquidation. This does not mean, though, that the court is without discretion

to consider the public interest under other Code sections.

This Circuit has found that statutes should be interpreted as a whole, rather than as isolated provisions:

... in seeking to construe a statute, we do not view any provision in isolation. Rather, we seek to understand a given provision by determining how it fits into the larger statute of which it is a part.

*Matter of McVey Trucking, Inc.,* 812 F.2d 311, 326 (7th Cir.1987); *cert. denied sub nom. Edgar v. McVey Trucking Co.,* —— U.S. ——, 108 S.Ct. 227, 98 L.Ed.2d 186 (1987). This court must follow that directive in interpreting § 364(d). The incurrence of debt is a relatively early step in the total scheme of railroad reorganization. It would be anomalous to require consideration of the public interest in major decisions, such as plan confirmation, while refusing to consider the public interest in underlying decisions regarding case administration.

Finally, the Court notes that the "expressio unius est exclusio alterius" maxim has limitations. It can be overcome by a strong indication of contrary legislative intent or policy. 2A Sutherland, *Statutory Construction* § 47.23 (4th ed. 1984). "The maxim is not a rule of substantive law but one of statutory construction and thus should be used with care." *Id.* at § 47.25. Clearly, the maxim should be used with care when its operation would reverse years of established case law.

Having reviewed the treatment of priming liens under the Act, as well as the Code's changes in the provisions relating to railroad reorganizations, this Court can only conclude that the public interest continues to apply to the question of the Trustee's ability to obtain priming liens.

Several Code cases would also appear to concur in the conclusion that the public interest continues to apply under the Code. *Wheeling–Pittsburgh Steel Corporation v. McCune,* 836 F.2d 153, 160–61 (3rd Cir. 1987); (railroad's common carrier status, with the concomitant obligation to serve the public interest, distinguishes railroad

reorganizations under Chapter 11); *In re Auto–Train Corp.*, 6 B.R. 510, 514 (Bankr. D.C.1980) (legislative history of Code reflects that "reorganization process is designed to afford a reasonable time frame within which the Trustee may seek to develop a plan of reorganization while affording to creditors an appropriate form of protection or assurance.")[3]

Having determined that the public interest does apply, the next question concerns the appropriate means of applying it in this case. In presenting his case, the Trustee has offered the testimony of State officials from the Illinois Department of Transportation, who expressed their opinion that the continuation of service on this line is essential. The fact of the State's willingness to provide interim financing also suggests that a public interest exists. At the early stages of the reorganization process of a railroad, it is sufficient to prove the existence of a public interest. Evidence as to the dimensions of that interest is relevant to proceedings specifically addressing the discontinuance of service, abandonment or liquidation, which are not before the court.

This does not mean that the public interest in and of itself compels a finding in favor of the Trustee. As stated in the above review of legislative history, there is an obvious Congressional concern for the protection of railroad creditors' rights. This concern is reflected in the requirement of adequate protection. Accordingly, this court will follow the suggestion in the legislative history of § 1165 and treat the public interest as a modifying factor in its consideration of § 364(d).

### Section 364 And The Requirement Of Adequate Protection

■ Section 364(d) sets forth a two-fold test which must be met before a priming lien will be approved. The section provides that:

> (1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—
>> (A) the trustee is unable to obtain such credit otherwise; and
>> (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.
> (2) In any hearing under this subsection, the trustee has the burden of proof on the issue of adequate protection.

There is no dispute regarding the first prong of this test, as Trustee has been unable to find other credit. The parties differ, though, as to whether the Trustee can provide adequate protection for the Lenders.

In considering this issue, the Court must bear in mind that this is an application under § 364(d). Because the case involves priming liens of a finite amount, adequate protection would ideally be equal to the amount of the combined liens. Neither side contends that CM & W's fixed assets are diminishing in value. Hence, the issue is one of incrementing the estate, rather than replacing lost value.

The Trustee proposes to supply adequate protection by enhancing the value of the Debtor's assets by at least the amount of the priming liens. According to the Trustee and his experts, this new value may take the form of increased revenues from operations and from a restructuring of CM & W's contractual relationships with IC and Amtrak. Another possible source of revenue would be income earned from the sale of overhead trackage rights.

At this early stage of this reorganization, the Trustee can only project possible sources of revenue. This case, and the

---

**3.** Lenders maintain that *Auto–Train* supports their position, as the *Auto–Train* court stated that adequate protection should be applied in the same manner as in non-bankruptcy cases. *In re Auto–Train Corp.*, 6 B.R. 510, 514 (Bankr. D.C.1980). The sole authority for that conclusion is a passage from *Collier on Bankruptcy*, 5

*Collier on Bankruptcy* 1165.02 at 1165–3— 1165–5 (15th ed. 1980). This court believes that the *Collier* analysis is incorrect, and would only follow *Auto–Train* in its conclusion regarding the applicability of the public interest in early stages of railroad reorganization.

Trustee's involvement have not yet advanced to a stage where it is possible for the Trustee, or anyone else for that matter, to determine whether the Railroad can operate as a viable entity or whether it should be liquidated. At this point, the Trustee would continue operations, while making track repairs and improvements. The Trustee contends that even if the Railroad is sold or liquidated, the value of those repairs will be reflected in a more favorable purchase price.

The Lenders contend that the increases in value projected by the Trustee are too speculative to furnish adequate protection. In addition, they advance the undisputed contention that they are already substantially undersecured. The Lenders maintain that they are entitled to assurances of the ultimate receipt of dollar-for-dollar compensation for any impairment to their current interest. Under the Lenders' analysis, the granting of the priming liens would violate the Fifth Amendment unless the Lenders receive a lien on other property or other value equivalent in amount to the amount of the loans secured by the priming liens. There is no possibility of a lien on substitute property as none exists that Lenders have not effectively liened. All assets of the Debtor are subject to the Lenders' lien.

The Lenders have presented extensive expert testimony to the effect that CM & W is not capable of continued operations as a viable entity. Their experts have addressed CM & W's continued operating losses, despite increased traffic over the line. Lenders' experts opine that competitive forces on CM & W's corridors, as well as the increased maintenance costs which accompany higher density, make any improvement in business ephemeral at best.

In addition, Lenders' experts raise serious questions regarding CM & W's ability to effectively compete in its corridors of operation.

Interestingly, Lenders' experts have confined their testimony as to the value of this Railroad to an estimate, a guess, as to its gross value if liquidated. While acknowledging that there may be other alternatives besides immediate liquidation of this Railroad or its continued operation in its present form, Lenders have apparently determined that they will receive no more than a part of their $107,000,000 on payment of their loans and brook no alternative but an immediate shutdown and liquidation. A far cry from their position a year and a half ago when their loan closed.

In view of the testimony presented by the parties, this Court concludes that the enhancement of value projected by the Trustee is speculative. Were this reorganization of an entity other than a railroad, the court would at this point find that the Lenders were not adequately protected. *See, e.g., In re Chevy Devco*, 78 B.R. 585, 588 (Bankr.C.D.Cal.1987); *In re St. Petersburg Hotel Associates, Ltd.*, 44 B.R. 944, 946 (Bankr.M.D.Fla.1984); *In re Hudson Valley Ambulance Service, Inc.*, 11 B.R. 860, 866 (Bankr.S.D.N.Y.1981). The Court will not do so in this case.

The concept of adequate protection is a flexible one, to be resolved on a case-by-case basis. *In re Briggs Transportation Co.*, 780 F.2d 1339, 1347 (8th Cir.1985); *In re O'Connor*, 808 F.2d 1393, 1398 (10th Cir.1987); *In re Martin*, 761 F.2d 472, 476 (8th Cir.1985). Excessive rigidity in applying the concept may not yield an appropriate solution. *In re Briggs Transportation Co.*, 780 F.2d at 1347. "A narrowly calibrated conception of adequate protection ... cannot accommodate the infinite number of variations possible in dealings between debtors and creditors." *Id.* at 1345 (citations omitted). *Cf.* McCullough, *Analysis of Bankruptcy Code Section 364(d): When will a Court Allow a Trustee to Obtain Post–Petition Financing by Granting a Superpriority Lien*, 93 Comm. L.J. 186, 202 (1988).

The heart of the adequate protection inquiry is an interpretation of the creditor's interest, as well as a valuation of that interest. *In re Briggs Transportation Co.*, 780 F.2d at 1345.

The interest in question is that of Lenders who have financed this Railroad with nominal contribution by ownership to its capitalization, and who have taken a security interest in all the Railroad's assets as

collateral together with a right to a 60% equity ownership in Debtor's parent. The Lenders' Credit Agreement also permits them to exercise substantial control over major decisions of the Debtor, such as track rehabilitation. (A fact in line with its right to own 60% of the Debtor's parent). This Railroad has a common carrier obligation to provide the public with rail services.

In the totality of these circumstances, the Lenders' interest, as that word is used in § 364(d), is subject to the public interest.

Adequate protection has never mandated a total regard of a creditor's interest so as to maintain the whole of such creditor's economic bargain during the reorganization process. *United Savings Association of Texas v. Timbers of Inwood Forest Associates, Ltd.,* — U.S. —, 108 S.Ct. 626, 630, 98 L.Ed.2d 740 (1988); *In re Briggs Transportation Co.,* 780 F.2d at 1345. What constitutes the bargain whose benefit should be protected turns on the parties' reasonable expectations. *Id.* at 1349. It is inconceivable to this court that sophisticated Lenders such as these were unaware of the possibility of priming loans in the event of reorganization.

This Court believes that the *Rock Island* standard furnishes adequate protection in this case. All three *Rock Island* factors are present here.

First, the evidence does not support a finding that the Debtor has no reasonable prospects of reorganization. The Trustee has presented considerable evidence that there may be a variety of alternatives available to CM & W, and that there is a possibility of sustaining operations during the time needed to investigate those alternatives. The Trustee is an experienced trustee who has made this evaluation as an officer of the court. "Predictions of any variety are never totally reliable but when they are made by a professional [trustee] operating within his area of competence and supported by data, such predictions are worthy of some deference." *In re Snowshoe Co., Inc.,* 789 F.2d 1085, 1089 (4th Cir.1986). At this point, only three months after appointment of the Trustee, reorganization is not clearly impossible. A reasonable time should be given to the Trustee to assess this possibility, in accordance with his statutory duties under § 1106(a)(3) and (4).[4]

Second, the proposed Trustee's Loans are undisputably essential to the continued operations of the Railroad.

The third *Rock Island* factor is also present, as the Loans would enable CM & W to improve service and would therefore, in the opinion of the court, have a direct beneficial effect on profitability.

Having concluded that all three factors are present, the court will allow this Application so that the Trustee may have a reasonable time to investigate the alternatives available to the Railroad.

The court is constrained to observe that if Lenders had their way they would accomplish under § 364(d) a purpose that at this stage of this reorganization could not be achieved without a hearing where the public interest would be an issue. The greater part of Lenders' evidence goes to abandonment or liquidation of CM & W. They have presented only a guess of what they consider to be the Railroad's value in liquidation. Lenders' strategy has been to rely on the provisions of § 364(d) to accomplish the purpose of § 1170 or § 1174.

4.  Section 1106(a) provides that:
    (a) A trustee shall—
    (3) except to the extent that the court orders otherwise, investigate the acts, conduct, assets, liabilities, and financial condition of the debtor, the operation of the debtor's business and the desirability of the continuance of such business, and any other matter relevant to the case or to the formulation of a plan;
    (4) as soon as practicable—
    (A) file a statement of any investigation conducted under paragraph (3) of this subsection, including any fact ascertained pertaining to fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor, or to a cause of action available to the estate; and
    (B) transmit a copy or summary of any such statement to any creditors' committee or equity security holders' committee, to any indenture trustee, and to such other entity as the court designates;

"There is an overriding consideration that equitable principles govern the exercise of bankruptcy jurisdiction." *Bank of Marin v. England*, 385 U.S. 99, 103, 87 S.Ct. 274, 277, 17 L.Ed.2d 197 (1966). A bankruptcy court cannot read statutes "with the ease of a computer." *Id.*

Finally, this court's overall view of the evidence is that it does not support a finding that as of today the Debtor has no reasonable hope of reorganization as an operating entity, either in whole or part, nor that an orderly disposition of its assets as an operating railroad unit, again either in whole or in part, is not a possibility. The history of this Railroad, Lender's relationship to it, as well as the history of this case, demand this opportunity be given to the Trustee if the public interest is not to be damned.

The Lenders' evidence has, however, convinced the court that current operating deficits cannot long continue. The court directs the Trustee that he is to be circumspect with respect to the expenditure of the funds available to him and that he promptly prepare, serve and file a budget as respects the intended use of the funds. The Court further suggests that he perform his duties as Trustee under § 1106(a)(3) and (4) as soon as practicable.

The court will therefore approve the Trustee's Application to incur secured debt.

This decision is without prejudice to the Lenders' right to bring an application for abandonment or liquidation, at which time the court would have before it a more complete record for making those difficult decisions regarding the public's interest.

### ORDER

This matter was heard upon the Borrowing Application as modified presented by Daniel R. Murray, the duly appointed and acting Trustee of the Debtor, Chicago, Missouri and Western Railway Company, seeking authority to enter into several loan agreements with agencies of the State of Illinois, all as more particularly described in the Findings of Fact and Conclusions of Law of even date and the objections thereto by Citicorp North America, Inc. and Heller Financial Services, Inc., the Lenders, and for the reasons set forth in the Findings and Conclusions as well as the Court's Memorandum Opinion of even date:

NOW THEREFORE IT IS ORDERED:

1. That the Trustee be and he is hereby authorized and empowered to, enter into and obtain from the Illinois Department of Transportation two loans and one grant for improvements to the Debtor property all as more particularly described in the Findings of Fact and Conclusions of Law and known as the Amtrak Loan, the Carrollton District Improvements Loan, and the Girard Interchange Grant and to execute and deliver such loan documents and adjustments as may be required not inconsistent with the Findings and Conclusions and the Borrowing Application as modified.

2. The Court hereby ratifies, approves and confirms the Order heretofore entered permitting the Trustee to obtain a $1,000,000 loan from the Illinois Department of Commerce and Community Affairs, more particularly described in the aforesaid Order (Order No. 44) which is incorporated herein as if fully set forth.

3. Preliminary authorization is hereby given to the Trustee to go forward with a loan in the amount of $10,000,000 from the Illinois Development and Finance Authority for the purpose of, among other things, improvement to the Debtor's properties all as more particularly set forth in the Findings of Fact and Conclusions of Law and the Borrowing Application provided that authorization to consummate this loan is subject to final hearing.